ROBINSON LYTLE AND LYDIA LOUISA LYTLE, HIS WIFE, ELIAS HOOPER AND MARY E. HOOPER, HIS WIFE, AND NATHAN H. CLOYES, A MINOR, UNDER TWENTY-ONE YEARS OF AGE, BY WILEY CLAYTON, HIS GUARDIAN, v. THE STATE OF ARKANSAS, WILLIAM RUSSELL, THE REAL ESTATE BANK OF THE STATE OF ARKANSAS, THE TRUSTEES OF SAID REAL ESTATE BANK AFORESAID, RICHARD C. BYRD, JAMES PITCHER, WM. P. OFFICER, EBENEZER WALTERS, JOHN WASSELL, JOHN W. COCKE, FREDERICK W. TRAPNALL, GEORGE C. WATKINS, SAMUEL H. HEMPSTEAD, JOHN ROBINS, JOHN PERCEFULL, JAMES S. CONWAY, HENRY F. PENDLETON, JACOB MITCHELL, THOMAS S. REYNOLDS, JOHN H. LEECH, WM. E. WOODRUFF, CHESTER ASHLEY, WM. J. BYRD, WM. W. DANIEL, AND JOHN MORRISON AND EDNEY, HIS WIFE.

The preëmption act of May 29th, 1830, conferred certain rights upon settlers upon the public lands, upon proof of settlement or improvement being made to the satis-

faction of the register and receiver, agreeably to the rules prescribed by the Commissioner of the General Land Office.

The commissioner directed the proof to be taken before the register and receiver, and afterwards directed them to file the proof where it should establish to their entire satisfaction the rights of the parties.

Where the proof was taken in presence of the register only, but both officers decided in favor of the claim, and the money paid by the claimant was received by the commissioner, this was sufficient. The commissioner had power to make the regulation, and power also to dispense with it.

This proof being filed, there was no necessity of reopening the case when the public surveys were returned.

The circumstance that the register would not afterwards permit the claimant to enter the section, did not invalidate the claim.

The preëmptioner had no right to go beyond the fractional section upon which his improvements were, in order to make up the one hundred and sixty acres to which settlers generally were entitled.

No selection of lands under a subsequent act of Congress could impair the right of a preëmptioner, thus acquired.

THIS case was brought up from the Supreme Court of the State of Arkansas, by a writ of error issued under the twenty-fifth section of the Judiciary Act.

It involved the validity of an entry of four fractional quarter-sections of land, one of which only, namely, the northwest fractional quarter of section number two in township one north of range twelve west, was passed upon by this court.

The history of the claim is this.

The act of Congress passed on the 29th of May, 1830 (4 Stat. at Large, 420), gave to every occupant of the public lands prior to the date of the act, and who had cultivated any part thereof in the year 1829, a right to enter at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty, or a quarter-section, to include his improvement; provided, the land shall not have been reserved for the use of the United States or either of the several States.

In the third section of the act it is provided, that, before any entries being made under the act, proof of settlement or improvement shall be made to the satisfaction of the register and receiver of the land district in which the lands may lie, agreeably to the rules prescribed by the Commissioner of the General Land Office for that purpose.

On the 10th of June, 1830, the commissioner issued his instructions to the receivers and registers, under the above act, in which he said, that the fact of cultivation and possession required "must be established by the affidavit of the occupant, supported by such corroborative testimony as may be entirely satisfactory to both; the evidence must be taken by a justice of the peace in the presence of the register and receiver." And the commissioner directed, that, where the improvement was wholly on a quarter-section, the occupant was limited to such

quarter; but where the improvement is situated in different quarter-sections adjacent, he may enter a half quarter in each to embrace his entire improvement.

Another circular, dated 7th February, 1831, was issued, instructing the land officers, where persons claiming preëmption rights had been prevented, under the above circular, from making an entry, " by reason of the township plats not having been furnished by the surveyor-general to the register of the land office, the parties entitled to the benefit of said act may be permitted to file the proof thereof, under the instructions heretofore given, identifying the tract of land as well as circumstances will admit, any time prior to the 30th of May next." And they were requested to " keep a proper abstract or list of such cases wherein the proof shall be of a character sufficient to establish, to their entire satisfaction, the right of the parties, respectively, to a preëmption," &c. "No payments, however, were to be received on account of preëmption rights duly established, in cases where the townships were known to be surveyed, but the plats whereof were not in their office, until they shall receive further instructions."

It may be here remarked, that the public surveys of the land in question were not completed until the 1st of December, 1833, nor returned to the land office until the beginning of the year 1834.

On the 2d of March, 1831, Congress passed an act (4 Stat. at Large, 473), "granting a quantity of land to the Territory of Arkansas, for the erection of a public building at the seat of government of said Territory"; but this act did not designate what specific tract of land should be granted for that purpose.

On the 23d of April, 1831, Cloyes filed the following affidavit in the office of the register, in support of his claim to a preëmption right.

*" Preëmption Claim, May* 29, 1830.

" Nathan Cloyes's testimony, taken on the 23d of April, 1831, before James Boswell, a justice of the peace for the County of Independence, in the register's office, in the presence of the register.

" Question by the Register. What tract of the public lands did you occupy in the year 1829, that you claimed a right of preëmption upon ?

" Answer. On the N. W. fract. ¼ of sec. 2, in township 1 north of range 12 west, adjoining the Quapaw line, being the first fraction that lies on the Arkansas River, immediately below the town of Little Rock, and contains about twenty-eight

or twenty-nine acres, as I have been informed by the county surveyor of Pulaski County; and I claim under the law the privilege to enter the adjoining fraction or fractions, so as not [to] exceed one hundred and sixty acres, all being on the river below the before-named fraction.

"Question as before. Did you inhabit and cultivate said fraction of land in the year 1829; and if so, what improvement had you in that year in cultivation?

"Answer. I did live on said tract of land in the year 1829, and had done so since the year 1826; and in the year 1829 aforesaid, I had in cultivation a garden, perhaps to the extent of one acre; raised vegetables of different kinds, and corn for roasting years (ears), and I lived in a comfortable dwelling, east of the Quapaw line, and on the before-named fraction.

"Question as before. Did you continue to reside and cultivate your garden aforesaid on the before-named fraction until the 29th of May, 1830?

"Answer. I did, and have continued to do so until this time.

"Question as before. Were you, at the passage of the act of Congress under which you claim a right of preëmption, a farmer; or, in other words, what was your occupation?

"Answer. I was a tin-plate worker, and cultivated a small portion of the fraction before named for the comfort of my family, and carried on my business in a shop adjoining my house.

"Question as before. Do you know of any interfering claim under the law, that you claim a preëmption right upon the fraction whereon you live?

"Answer. I know of none. And further this deponent saith not.

"NATHAN CLOYES.

"Sworn and subscribed to before me, the date aforesaid.
"J. BOSWELL, J. P."

On the same day, Cloyes filed also the corroborative testimony of John Saylor, Nathan W. Maynor, and Elliott Bursey.

On the 28th of May, 1831, the register and receiver made the following entry, and gave Cloyes the following certificate.

"*Preëmption Claim*, 29th May, 1830.

"Nathan Cloyes, No. 24, N. W. fractional ¼ 2, 1 N. 12 W. granted for the above fractional ¼, and reject the privilege of entering the adjoining fractions. May 28, 1831.

"H. BOSWELL, *Register*.
JOHN REDMAN, *Receiver*."

27*

On the 15th of June, 1832, Congress passed an act (4 Stat. at Large, 531), granting one thousand acres of land to the Territory of Arkansas, "contiguous to, and adjoining the town of Little Rock," for the erection of a court-house and jail at Little Rock.

On the 4th of July, 1832, Congress passed another act (4 Stat. at Large, 563), authorizing the Governor of the Territory to select ten sections of land to build a legislative house for the Territory.

On the 14th of July, 1832, Congress passed an act (4 Stat. at Large, 603); giving to persons entitled to preëmption under the act of 1830, (but who had not been able to enter the same within the time limited, because the township plats had not been made and returned,) one year from the time when such township plats should be returned, to enter said lands upon the same terms and conditions as prescribed in the act of 1830.

On the 2d of March, 1833, Congress passed an act (4 Stat. at Large, 661) authorizing the Governor of the Territory to sell the lands granted by the act of 15th June, 1832.

Under these acts of Congress, Governor Pope made a part of his location upon the fractional quarter-sections in question, upon the 30th of January, 1833.

It has been already mentioned, that on the 1st of December, 1833, the public surveys were completed, and returned to the land office in the beginning of the year 1834.

On the 5th of March, 1834, the heirs of Cloyes (he being dead) paid for the four fractional quarter-sections, and took the following receipt.

*"Receiver's Office at Little Rock, March 5, 1834.*

"Received by the hands of Ben. Desha, from Lydia Louisa Cloyes, Mary Easther Cloyes, Nathan Henry Cloyes, and William Thomas Cloyes, (heirs of Nathan Cloyes, deceased, late of Pulaski County, A. T.,) the sum of one hundred and thirty-five dollars and seventy-six and $\frac{1}{4}$ cents, being in payment for the northwest and northeast fractional quarters of section two, and the northwest and northeast fractional quarters of section one, in fractional township one, north of the base line, and range twelve, west of the fifth principal meridian, containing in all one hundred and eight 61-100 acres, at $ 1.25 per acre.

" $ 135.76$\frac{1}{4}$.                P. T. CRUTCHFIELD, *Receiver.*

" A part of the land for which the within receipt is given, to wit, 'the northwest fractional quarter of section two,' forms a part of the location made by Governor Pope, in selecting 1,000

acres adjoining the town of Little Rock, granted by Congress to raise a fund for building a court-house and jail for the Territory of Arkansas ; and this indorsement is made by direction of the Commissioner of the General Land Office.

"P. T. CRUTCHFIELD, *Receiver.*
" *Receiver's Office at Little Rock, March 5,* 1834."

In 1843 the heirs of Cloyes filed a bill against all the persons mentioned in the title of this statement, who had purchased various interests in these fractional quarter-sections, and claimed title under Governor Pope. The bill was filed in the Pulaski Circuit Court of the State, setting forth the above facts, and praying that the defendants might be ordered to surrender their patents and other muniments of title to the complainants.

The parties who were interested in the northwest fractional quarter of section number two answered the bill. The other parties demurred.

The answers admitted that proof of a preëmption right to the northwest fractional quarter of section two was made by Cloyes at the time and in the manner set forth in the bill ; but deny that he had a valid preëmption to it. They admit also, that Governor Pope selected said quarter in pursuance of the two acts of Congress of 15th June, 1832, and 2d March, 1833, but deny that he did so illegally or by mistake.

In July, 1844, the Pulaski Circuit Court sustained the demurrer of the parties who had demurred, and dismissed the bill as to those who had answered.

In July, 1847, the Supreme Court of Arkansas, to which the cause had been carried, affirmed the judgment of the court below, and a writ of error brought the case up to this court.

It was argued by *Mr. Lawrence* and *Mr. Badger,* for the plaintiffs in error, and *Mr. Sebastian,* for the defendants in error.

The counsel for the plaintiffs in error said that the three following questions arose.

1. Was Cloyes entitled to have entered the land in question on the 28th of May, 1831, if the township plat had at that time been in the land office?

2. Did the act of 15th June, 1832, granting to the Territory of Arkansas one thousand acres of land, generally, confer any specific right to this particular fraction before its actual selection by the Governor?

3. If not, then did not the act of 14th July, 1832, reserve this fraction from selection, location, and sale, until the expira-

tion of one year from the return of the township plat to the land office?

In regard to the first question, there is but one objection which can be urged with even a tolerable amount of plausibility in its favor, (that which is made the first ground of demurrer by those who have demurred to the bill,) namely, that the proof exhibited in the bill does not appear to have been taken in the presence of the register and receiver.

The circular dated June 10, 1830, from the General Land Office, contains, among other things, the following paragraph, viz. : — "The evidence must be taken by a justice of the peace, in the presence of the register and receiver, and be in answer to such interrogatories propounded by them as may be best calculated to elicit the truth."

The caption of the testimony in the record is, "Nathan Cloyes's testimony, taken on 23d April, 1831, before James Boswell, a justice of the peace for the County of Independence, in the register's office, in the presence of the register." It is maintained that this omission in the caption to make it appear that the evidence was taken before the register and receiver, destroys Cloyes's right of preëmption. To this view several answers may be given. It does not positively appear that the receiver was not present, and the presumption of law is, that a government officer has done his duty till the contrary appears. Wilcox v. Jackson, 13 Pet. 511; Winn et al. v. Patterson, 9 Pet. 663; 1 Cooke, (Tenn.) 492; 3 Yerger, 309; 2 Tennessee, 154, 284, 306, 421. It does appear that both the register and receiver, on the same day (23d April, 1831), admitted Cloyes's right to enter the land in question.

But suppose the proof was not taken in presence of both the register and receiver, still the land office circular was merely directory to the officers as to the manner of taking the proof, and any mere error or irregularity on the part of the officers cannot prejudice the rights of the preëmption. 3 Johns. Ch. 275; 2 Cond. Rep. 237, 243; 2 Edw. Ch. 261; 4 How. (Miss.) 57; Ross v. Doe, 1 Pet. 655; Pond v. Negus, 3 Mass. 230; Rodebaugh v. Sanks, 2 Watts, 9; Holland v. Osgood, 8 Verm. 280; Corliss v. Corliss, 8 Verm. 390; People v. Allen, 6 Wend. 486.

The Commissioner of the General Land Office, who issued the circular, by authorizing the receiver to take the payment offered by the heirs of Cloyes, without taking any exception to the manner in which the proof had been taken, suspended, *pro hac vice*, the regulation, and sanctioned the mode in which it was in fact taken. The regulation itself was full of incon-

venience, was never fully carried out in fact; and was finally rescinded by the circular of 22d July, 1834 (2 Land Laws, 589).

The decision of the register and receiver was in favor of Cloyes's right to the northwest fractional quarter of section two, and it being upon a matter within their exclusive jurisdiction, and no appeal being given, that decision was final and conclusive. Wilcox v. Jackson, 13 Pet. 498.

Cloyes's right of preëmption, then, was perfect, and he was only prevented from consummating it by the fact, that the township plat was not returned before the expiration of the preëmption law of 1830.

2. The act of 15th June, 1832, (which was passed after the act of 20th May, 1830, had expired,) was only a general grant of one thousand acres of land in the vicinity of Little Rock, without any specification or description of any particular land whatever, "which lands," it provides, "shall be selected by the Governor of the Territory in legal subdivisions," &c.

We maintain that, before such selection, there was no appropriation of, or lien upon, any particular tract. It was the selection by the Governor that was to withdraw any tract from the public domain. 5 How. 10.

Covenant to settle particular lands, if for valuable consideration, creates a lien upon the lands, which will be enforced against all but a purchaser for value and without notice. 1 Vern. 206; 1 P. Wms. 282, 429.

But covenant to settle lands of a particular value, without mentioning any lands in particular, creates no lien on any of the covenantor's lands. 1 P. Wms. 429; 4 Bro. Ch. 468, Eden's note; Russell v. Transylvania University, 1 Wheat. 432.

Governor Pope did not make his selection until the 30th of January, 1833.

3. Prior to this selection, the act of 14th July, 1832, was passed, giving to persons entitled to preëmption under the act of 29th May, 1830, but who had not been able to enter said lands, because the township plats had not been made and returned, the right to enter said lands, on the same conditions in every respect, within one year from the time when said township plats should be returned.

It is clear, then, that if the grant of one thousand acres to Arkansas did not confer a specific right to any particular land, until selection made by its Governor, (and that selection was not made until after this act of 14th July, 1832, was passed,) then the latter act reserved from any future selection lands which came within its provisions. The northwest fractional quarter

of section two could not be legally selected by the Governor, in 1833, because Cloyes had a right of preemption to it under the act of 29th May, 1830, which the want of the township plat had alone prevented him from completing. That township plat was not returned until the beginning of the year 1834. The act of 14th July, 1832, gave him until the year 1835 to make his entry; and within that time he made his payment, and applied to enter the land.

It is manifest, then, that the bill should have been sustained by a decree in favor of the right of Cloyes's heirs to the north-west fractional quarter of section two, on which his settlement and cultivation were proved.

As to the remaining fractional quarters, the parties interested have filed a demurrer to the bill, setting out several grounds of demurrer. The first and principal of these grounds has already been answered. Most of the other grounds are but different statements of a single objection, namely, that Cloyes, having proved his settlement upon one quarter fractional section alone, could not legally claim any thing beyond the fractional quarter on which he was settled.

The act of 29th May, 1830, does not restrict the right of preemption to the quarter-section on which settlement is made. The first section is, — "That every settler or occupant of the public lands, prior to the passage of this act, who is now in possession, and cultivated any part thereof in the year one thousand eight hundred and twenty-nine, shall be, and he is hereby, authorized to enter with the register of the land office for the district in which such lands may lie, by legal subdivisions, any number of acres, not more than one hundred and sixty, or a quarter-section, to include his improvements, upon paying," &c. 1 Land Laws, 173.

The only restriction which the law imposes is one hundred and sixty acres, to be entered by legal subdivisions, and to include his improvement. Within these conditions, he may enter any number of acres and any number of legal subdivisions. But we are told that the General Land Office put upon this law the construction, that the claimant was to be confined to the fraction on which he settled. It is true that for a time this construction did prevail in the General Land Office, and, as we contend, without any warrant of law.

But that construction has long since been overruled in that office. It was overruled by express act of Congress. The second section of the act of 14th July, 1832, provided, — "That the occupants upon fractions shall be permitted, in like manner, to enter the same, so as not to exceed in quantity one quarter-

section; and if the fractions exceed a quarter-section, the occupant shall be permitted to enter one hundred and sixty acres, to include his or their improvement, at the price aforesaid."

·Since that time, a different construction has prevailed in the General Land Office. See ·Circular, March 1, 1834, 2 Land Laws, 587. See also the letter of Secretary of Treasury of October 31, 1833, 2 ·Land Laws, 572; also Circular of 7th May, 1833.

*Mr. Sebastian,* for the defendants in error, contended, —

First, That the proof of preëmption was not taken in the presence of the register and receiver, agreeably to the rules prescribed by the Commissioner of the Land Office. The authority conferred upon them was joint, not only in taking the testimony, but in deciding on the sufficiency of the proof. Proof made to one was not a compliance with the law. 5 How. (Miss.) 752; 13 Peters, 511; 1 Peters, 340; Attorney-General's Opinion, in 2 Land Laws, 85, 98.

But·it is said, that it does not positively appear that the receiver was not present, and the presumption of law is, that every government officer does his duty until the contrary appears. The rule is well stated, but admits of exceptions. It is a mere rule of evidence, to supply proof of relevant facts where the contrary does not appear. The silence of the proof. upon·this subject would have left the presumption to operate to its fullest extent in favor of the legality of the proceedings, but it went further, and·disclosed the fact that the proof was taken before the register alone. *Conclusio unius exclusio alterius,* is a rule of construction that may well apply in this instance. It is not easy to see how·the absence of the receiver could be better stated than in the. terms which affirmed the presence of the register.

Again, it is contended that the land office ·circular requiring proof to be taken in the presence of the register and receiver was·directory to the officers as to the manner of taking the proof, and that any irregularity upon the part of the officers cannot prejudice the right of preëmption.

It is undoubtedly true, that where the State intrusts a duty to a public officer, and prescribes a particular manner in which he. shall perform it, an irregularity in the manner of its performance shall not prejudice the right appertaining to the act of performance. The rule extracted from the cases seems to admit of many exceptions. It applies to the acts of ministerial officers, and not to those who act in a judicial. capacity; to those who act irregularly within the limits of authority, but

not where there is a total want of it (see Wilcox *v.* Jackson, 13 Peters; 2 Tenn. 154); to those who act as a public and common agent, independent of or as a trustee of the parties, but not where the act is controlled or to be done by the party himself. 2 Tenn. 284. Now here the register and receiver acted in a judicial capacity. (Wilcox *v.* Jackson, and Opinion of Attorney-General, above cited.) The act of May 29th, 1830, § 4, makes it the duty of the settler to make the proof, and the circular from the land office prescribes how and before whom he shall make it. The true question, therefore, in this case is, not whether a ministerial duty has been imperfectly performed, but whether a judicial function has not been performed without any authority at all. The only adjudged case upon the direct point has taken this view of the question. Fulton *v.* McAfee, 5 How. (Miss.), above cited.

The supposition that the letter from the Treasury Department (2 Land Laws, 572), by authorizing the receiver to take payment from Cloyes, suspended *pro hac vice* the general regulation as to proof, is unfounded in the terms of that letter. It was done expressly, not to waive any objection, but "to enable them the more effectually to maintain their rights before the judicial tribunals, without prejudice to an adjudication of the land office." It decided in favor of Governor Pope's locations, and left Cloyes's claim just where it found it. Had it been so intended, it was then too late to remove the defect and cut out the intervening rights under the location of Governor Pope. The general regulation was not repealed until July 22, 1834, and until all the rights in controversy had been fixed under the old law.

If the proof of preëmption should be considered regular, and in compliance with the act, and the authoritative instructions issued in conformity with it, then it is contended that the northwest fractional quarter of section two, a part of the lands sued for, was specifically appropriated by the act of Congress of 15th June, 1832 (4 Stat. at Large, 531), granting one thousand acres of land to the Territory of Arkansas, "contiguous to and adjoining the town of Little Rock"; so that when the act of 14th July, 1832 (4 Stat. at Large, 603), extending and reviving that of 29th May, 1830, was passed, there was nothing on which the act could operate. When the supplemental act was passed, the tract on which the preëmption had once been granted and lapsed was no longer unappropriated land. The original act, thus revived, extended the right of preëmption to unappropriated lands only. The land granted by the act of 15th June to the Territory could not, on the 14th of July fol-

lowing, be considered unappropriated. Upon this point the instructions from the General Land Office of 10th June, 1830, were explicit. (2 Land Laws, 539.) In these it is said, "that all lands not otherwise appropriated, of which the township plats are or may be on file in the register's office, prior to the expiration of the law, are subject to entry." The preëmption act of 1830 expired by its own limitation on the 29th of May, 1831, and before it was revived, July 14, 1832, the act of 15th June granted the tract of land to the Territory. The proof of preëmption describes the tract cultivated as being immediately below Little Rock, and the act of 15th June, 1832, above mentioned, grants to the Territory of Arkansas "a quantity of land, not exceeding one thousand acres, contiguous to and adjoining the town of Little Rock." By this act the United States was concluded. It was not executory, but passed a present interest, and executed itself. It was not a general grant, but specific, and conveyed, not a mere right at large to locate, but certain lands, and although it did not pretend to fix the exterior limits or boundaries, yet one feature was well defined, most important in its operation in this case. The land was "contiguous to and adjoining the town of Little Rock." However indefinite in some features, its terms of description embraced the very tract on which the ancestor of complainants had claimed a preëmption. This grant was a contract, and constituted a lien upon the lands coming within its descriptive terms. Pinson and Harkins *v.* Ivey, 1 Yerg. 322; 2 Vern. 482; 1 P. Wms. 429; 2 Vern. 97; 1 Eq. Cas. Abr. 31, ch. 4, and 87, ch. 6.

It was, if not a grant, at least a reservation of all those lands, "adjoining and contiguous to the town of Little Rock," for the satisfaction of the grant, and, to that extent and for that purpose, was an appropriation by law. It was an exemption of such lands from the operation of all subsequent laws, until its objects could be satisfied and the act have effect. When the land should be selected, the title would legitimately relate to the date of the act, which is the source of the title. This relation, however, is unnecessary to overreach the title of complainants, as the selection of the lands was long prior to the application of Cloyes's heirs to enter them, in March, 1834, under the act of 14th July, 1832. Not only so, but on the 2d of March, 1833, after the location or selection by Governor Pope, an act was passed authorizing him to sell the lands thus selected, of which the northwest fractional quarter of section two was a part. See 4 Stat. at Large, 661.

This brings us to the consideration of the question as to the competency of the United States to thus appropriate the land

in controversy, (as they most unquestionably did by the acts referred to,) and the nature of the interest in the public domain acquired by settlers upon it.

(The counsel then proceeded to argue, that the preëmption law was not a grant, but merely a bounty which the United States may at any time before final acceptance of its terms and performance of its conditions wholly modify, destroy, or restrict. 2 Land Laws, 101, 102; 9 Cranch, 92; 1 Scam. 367; 3 Pet. C. C. 40; 5 Martin, N. S. 417; 6 Martin, 342; 9 La. Rep. 53; 5 How. Miss. 765; 13 Pet. 514.)

But, waiving the question whether the act of June, 1832, was a grant, or even a positive reservation, I recur again to the argument, that this act was at least an appropriation. That is all that is necessary to sustain the title of the defendants. It is sufficient alone that the act of 15th June, 1832, was a " setting apart " of a portion of the public domain for any purpose. This is but an indication by the government, through some one of its departments, of its intention to devote it to some particular purpose. The title still remains in the United States, and the land thus indicated is withheld from all subsequent laws. Whether as a grant the act was specific or general, whether it passed a present or future interest, commencing upon the " selection," cannot alter its operation as an appropriation. It can be an appropriation of all lands within its descriptive terms, without being a grant of them. The donation was for one thousand acres, " contiguous to and adjoining the town of Little Rock." The appropriation was therefore coextensive, not with the boundaries that might be ascertained by the selection under the act, but it was as broad as the description of the lands out of which the selection was to be made. This will be fully comprehended by observing the clear distinction between the tract selected and the body of lands out of which the selection was authorized to be made. The appropriation was temporary, and for a particular purpose. Still, it was to this extent an appropriation. By this act the lands were " set apart," and severed from the public domain, until the purposes of that act could be satisfied. Doubtless it is true, that, when the objects of the appropriation were accomplished, the lands held from disposition by its force would relapse into the mass of unappropriated land. But in this case, the appropriation of this tract, amongst others embraced in this description of the law, held it until it was selected, and the selection held it for ever.

Again, when the act of 14th July, 1832, was passed, the lands claimed by the complainants were not surveyed, nor

any plats on file in the register's office at the time of the expiration of the act of 1830. The bill states the surveys to have been made, and the plats thereof to have been returned, in December, 1833, and January, 1834. To such lands the act of 1830 did not extend the right of preëmption. On this point the circular letter of instructions from the General Land Office, of June 10th, 1830 (2 Land Laws, 540), is explicit: — "Lands not otherwise appropriated, of which the township plats are or may be on file in the register's office prior to the expiration of the law (29th May, 1831), are subject to entry under the act." These instructions are in precise conformity with the act, and should be considered as a part of it. The whole tenor of the act shows that it never contemplated the possibility of a preëmption on any other than surveyed lands, officially known to be such. All the terms of the act, particularly the fourth section, contemplate the maps of the surveys being on file. The case of settlers upon the unsurveyed domain was a clear omission. Such settlers never came within its provisions. The act of 14th July, 1832, was designed for the relief of that class. So far it was not a revival, but an extension, of the terms of the act of 1830. It embraced what the old act did not. The cultivation and possession of unsurveyed land was nothing under the first act. They were the very basis of right under the new law. Whatever interest, therefore, the complainants had, is legally to be ascribed to this latter act, notwithstanding the proof of preëmption before the expiration of the preëmption law. Should this question, then, be considered as a mere contest between titles by relation, extending retrospectively to the first link in them, the defendants have the elder title.

The second ground of demurrer is, " that the bill shows on its face that said Cloyes was not the settler or occupant of the northwest and northeast quarters of section two, and northwest and northeast quarters of section one, township one, north range twelve west." The third, fourth, fifth, sixth, seventh, eighth, and ninth causes of demurrer are all based upon the second cause assigned, are altogether substantially the same proposition, and may be considered in connection. The objections which they present are applicable alone to the title of complainants to the northeast fractional quarter of section two, and the northwest and northeast fractional quarters of section one, part of the lands claimed by the complainants. These tracts were claimed under the privilege, as appurtenant to the right of preëmption, proven on the tract cultivated, which privilege was rejected. These three fractions are held by one

of the defendants under patents, issued upon selections made by Governor Pope, under different acts of Congress, granting ten sections of land to the Territory. Those acts have no connection with the title to the tract before considered. The claims thus located were assigned to Wm. Russell, one of the defendants.

That the privilege of preëmption did not extend to the additional fractions claimed as appurtenant to it, that the decision of the register and receiver was right in rejecting it, and that decision conclusive until reversed or set aside, and that the subsequent proceedings of the receiver at Little Rock in granting his certificate were unwarranted, appear by reference to the act of 29th May, 1830, the instructions of the Commissioner of the General Land Office under it, and the opinions of the Attorney-General in exposition of them.

(The counsel then proceeded to show that the title of the complainants was not good to the three fractional quarter-sections.)

Mr. Justice McLEAN delivered the opinion of the court.

This writ of error brings before us a decree of the Supreme Court of the State of Arkansas.

The complainants filed their bill in the Pulaski Circuit Court of that State, charging that Nathan Cloyes, their ancestor, during his life, claimed a right of preëmption under the act of Congress of the 29th of May, 1830, to the northwest fractional quarter of section numbered two in township one north of range twelve west. That he was in possession of the land claimed when the above act was passed, and had occupied it in 1829. That he was entitled to enter, by legal subdivisions, any number of acres, not more than one hundred and sixty, or a quarter-section, to include his improvement, upon paying the minimum price for said land. That Cloyes, in his lifetime, by his own affidavit, and the affidavits of others, made proof of his settlement on, and improvement of, the above fractional quarter, according to the provisions of the above act, to the satisfaction of the register and receiver of said land district, agreeably to the rules prescribed by the Commissioner of the General Land Office; and on the 20th of May, 1831, Hartwell Boswell, the register, and John Redman, the receiver, decided that the said Cloyes was entitled to the preëmption right claimed.

That on the same day he applied to the register to enter the northwest fractional quarter of section two, containing thirty acres and eighty-eight hundredths of an acre; also the north-

Lytle et al. *v.* The State of Arkansas et al.

east fractional quarter of the same section, containing forty-two acres and thirty-two hundredths of an acre ; and also the northwest and northeast fractional quarters of section numbered one, in the same township and range, containing thirty-five acres and forty-one hundredths of an acre, the said fractional quarter-sections containing one hundred and eight acres and sixty-one hundredths of an acre ; and offered to pay the United States, and tendered to the receiver, the sum of one hundred and thirty-five dollars seventy-six and a fourth cents, the government price for the land.    But the register refused to permit the said Cloyes to enter the land, and the receiver refused to receive payment for the same, on the ground that he could only enter the quarter-section on which his improvement was made.    That the other quarter-sections were contiguous to the one he occupied.

That under the act of the 29th of June, 1832, entitled, "An act establishing land districts in the Territory of Arkansas," the above fractional sections of land were transferred to the Arkansas land district, and the land office was located at Little Rock, to which the papers in relation to this claim of preëmption were transmitted.

The bill further states, that under an act of Congress of the 15th of June, 1832, granting to the Territory of Arkansas one thousand acres of land for the erection of a court-house and jail at Little Rock, and under "An act to authorize the Governor of the Territory to sell the land granted for a court-house and jail, and for other purposes," dated 2d March, 1833, John Pope, then Governor of said Territory, among other lands, selected, illegally and by mistake, for the benefit of the Territory, the said northwest fractional quarter of section numbered two, for which a patent was issued to the Governor of the Territory and his successors in office, for the purposes stated.

That the said John Pope, as Governor, under an act granting a quantity of land to the Territory of Arkansas, for the erection of a public building at the seat of government of said Territory, dated 2d March, 1831, and an act to authorize the Governor of the Territory to select ten sections to build a legislative house for the Territory, approved 4th July, 1832, selected the northeast fractional quarter of section two, and the northwest fractional quarter and northeast fractional quarter of section one, as unappropriated lands, and, having assigned the same to William Russell, a patent to him was issued therefor, on or about the 21st of May, 1834, both of which, the complainants allege, were issued in mistake and in violation of law, and in fraud of the legal and vested right of their ancestor, Cloyes.

That after the refusal of the receiver to receive payment for

28 *

the land claimed, an act was approved, 14th July, 1832, continuing in force the act of the 29th of May, 1830, and which specially provided, that those who had not been enabled to enter the land, the preëmption right of which they claimed, within the time limited, in consequence of the public surveys not having been made and returned, should have the right to enter said lands on the same conditions, in every respect, as prescribed in said act, within one year after the surveys should be made and returned, and the occupants upon fractions in like manner to enter the same, so as not to exceed in quantity one quarter-section. And that this act was in full force before Governor Pope selected said lands, as aforesaid. That the public surveys of the above fractional quarter-sections were made and perfected on or about the 1st of December, 1833, and returned to the land office the beginning of the year 1834. On the 5th of March, 1834, the complainants paid into the land office the sum of one hundred and thirty-five dollars and seventy-six and one fourth cents, in full for the above-named fractional quarter-sections. That a certificate was granted for the same, on which the receiver indorsed, that the northwest fractional quarter of section two was a part of the location made by Governor Pope in selecting one thousand acres adjoining the town of Little Rock, granted by Congress to raise a fund for building a court-house and jail for the territory; and that that indorsement was made by direction of the Commissioner of the General Land Office.

That the register of the land office would not permit the said fractional quarter-sections to be entered.

That the patentees in both of said patents, at the time of their application to enter the lands, had both constructive and actual notice of the right of Cloyes. And that the present owners of any part of these lands had also notice of the rights of the complainants.

The answer of the Real Estate Bank and trustees admits the proof of the preëmption claim of Cloyes, but they say, "From beginning to end it is a tissue of fraud, falsehood, and perjury, not only on the part of Cloyes, but also on the part of those persons by whose oaths the alleged preëmption was established. And they allege, that the lots four, five, and six, in block eight, in fractional quarter-section two, claimed by the bank, were purchased of Ambrose H. Sevier in the most perfect good faith, and without any notice or knowledge whatever, either constructive or otherwise, of any adverse claim thereto." That they have made improvements on the same, which have cost twenty-five thousand dollars, without ever having it intimated

to them that there was any adverse claim, until all of said improvements had been completed.

James S. Conway, in his answer, denies the validity of the preëmption right set up in the bill, and alleges that it was falsely and fraudulently proved. And he says, that when he purchased, "he did not know that there was any *bonâ fide* adverse claim or right to said lots, or any of them ; and he avers, that he is an innocent purchaser for a valuable consideration, and without actual or implied notice, except as hereinafter stated." And he admits that he occasionally heard the claim of Cloyes spoken of, but always with the qualification that it was fraudulent and void, and had been rejected by the government.

Samuel A. Hempstead, in his answer, denies that, at the time of the purchase of said lots, or the recording of said deed, he had notice, either in fact or law, of the complainants' claim.

The other defendants filed special demurrers to the bill. The Circuit Court, as it appears, sustained the demurrers, and in effect dismissed the bill. The cause was taken to the Supreme Court of Arkansas by a writ of error, which affirmed the decree of the Circuit Court.

The demurrers admit the truth of the allegations of the bill, and, consequently, rest on the invalidity of the right asserted by the complainants. The answers also deny that Cloyes was entitled to a preëmptive right, and a part, if not all of them, allege that they were innocent purchasers, for a valuable consideration, without notice of the complainants' claim.

The first section of the act of 29th May, 1830, gave to every occupant of the public lands prior to the date of the act, and who had cultivated any part thereof in the year 1829, a right to enter at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty or a quarter-section, to include his improvement ; provided the land shall not have been reserved for the use of the United States, or either of the several States.

In the third section of the act it is provided, that, before any entries being made under the act, proof of settlement or improvement shall be made to the satisfaction of the register and receiver of the land district in which the lands may lie; agreeably to the rules prescribed by the Commissioner of the General Land Office for that purpose.

On the 10th of June, 1830, the commissioner issued his instructions to the receivers and registers under the above act, in which he said, that the fact of cultivation and possession required "must be established by the affidavit of the occupant, supported by such corroborative testimony as may be entirely

satisfactory to both; the evidence must be taken by a justice of the peace in the presence of the register and receiver." And the commissioner directed, that, where the improvement was wholly on a quarter-section, the occupant was limited to such quarter; but where the improvement is situated in different quarter-sections adjacent, he may enter a half quarter in each to embrace his entire improvement.

Another circular, dated 7th February, 1831, was issued, instructing the land officers, where persons claiming preëmption rights had been prevented under the above circular from making an entry, "by reason of the township plats not having been furnished by the surveyor-general to the register of the land office, the parties entitled to the benefit of said act may be permitted to file the proof thereof, under the *instructions heretofore given*, identifying the tract of land as well as circumstances will admit, any time prior to the 30th of May next." And they were requested to "keep a proper abstract or list of such cases wherein the proof shall be of a character sufficient to establish to their entire satisfaction the right of the parties, respectively, to a preëmption," &c. "No payments, however, were to be received on account of preëmption rights duly established, in cases where the townships were known to be surveyed, but the plats whereof were not in their office, until they shall receive further instructions."

Under this instruction, on the 28th of May, 1831, the register and receiver held that Nathan Cloyes was entitled to the north-west fractional quarter, as stated in the bill, but rejected the privilege of entering the adjoining fractions.

Several objections are made to this procedure. It is contended that the land officers had no authority to act on the subject, until the surveys of the township were returned by the surveyor-general to the register's office; and, also, that in receiving the proof of the preëmption right of Cloyes, the land officers did not follow the directions of the commissioner.

The first instruction of the commissioner, dated 10th June, 1830, required the proof to be taken in presence of the register and receiver, and it appears that the proof was taken in the presence of the register only.

The law did not require the presence of the land officers when the proof was taken, but, in the exercise of his discretion, the commissioner required the proof to be so taken. Having the power to impose this regulation, the commissioner had the power to dispense with it, for reasons which might be satisfactory to him. And it does appear that the presence of the register only, in Cloyes's case, was held sufficient. The right was sanctioned by both the land officers, and by the commis-

sioner also, so far as to receive the money on the land claimed, without objection as to the mode of taking the proof. And, as regards the authority for this procedure by the land officers. it appears to be covered by the above circular of the commissioner, dated 7th February, 1831. In the absence of the surveys, the parties entitled to the benefits of the act of 1830 were "permitted to file the proof thereof," &c., identifying the tract of land, as well as circumstances will admit, any time prior to the 30th of May, 1831.

The register and receiver were constituted, by the act, a tribunal to determine the rights of those who claimed preemptions under it. From their decision no appeal was given. If, therefore, they acted within their powers, as sanctioned by the commissioner, and within the law, and the decision cannot be impeached on the ground of fraud or unfairness, it must be considered final. The proof of the preemption right of Cloyes being "entirely satisfactory" to the land officers under the act of 1830, there was no necessity of opening the case, and receiving additional proof, under any of the subsequent laws. The act of 1830 having expired, all rights under it were saved by the subsequent acts. Under those acts, Cloyes was only required to do what was necessary to perfect his right. But those steps within the law, which had been taken, were not required to be again taken.

It is a well-established principle, that where an individual in the prosecution of a right does every thing which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case the preemptive right of Cloyes having been proved, and an offer to pay the money for the land claimed by him, under the act of 1830, nothing more could be done by him, and nothing more could be required of him under that act. And subsequently, when he paid the money to the receiver, under subsequent acts, the surveys being returned, he could do nothing more than offer to enter the fractions, which the register would not permit him to do. This claim of preemption stands before us in a light not less favorable than it would have stood if Cloyes or his representatives had been permitted by the land officers to do what, in this respect, was offered to be done.

The claim of a preemption is not that shadowy right which by some it is considered to be. Until sanctioned by law, it has no existence as a substantive right. But when covered by the law, it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it. It is founded in an enlightened public policy, rendered necessary by the enterprise of our citizens. The adventurous pioneer, who is

found in advance of our settlements, encounters many hardships, and not unfrequently dangers from savage incursions. He is generally poor, and it is fit that his enterprise should be rewarded by the privilege of purchasing the favorite spot selected by him, not to exceed one hundred and sixty acres. That this is the national feeling is shown by the course of legislation for many years.

It is insisted, that the preëmption right of Cloyes extended to the fractional quarter-sections named in the bill, the whole of them being less than one hundred and sixty acres. We think it is limited to the fractional quarter on which his improvement was made. This construction was given to the act by the commissioner in his circular of the 10th of June, 1830. He says, "The occupant must be confined to the entry of that particular quarter-section which embraces the improvement." The act gives to the occupant whose claim to a preëmption is established the right to enter, at the minimum price, by legal subdivisions, any number of acres not exceeding one hundred and sixty. But less than a legal subdivision of a section or fraction cannot be taken by the occupant. It is contended, however, that several fractional quarter-sections adjacent to the one on which the improvement was made may be taken under the preemptive right, which shall not exceed in the whole one hundred and sixty acres. And the second section of the act of 14th July, 1832, which provides, "that the occupants upon fractions shall be permitted, in like manner, to enter the same so as not to exceed in quantity one quarter-section," it is urged, authorizes this view. But in the case of Brown's Lessee *v.* Clements et al., 3 How. 666, this court say, the act of 29th May, 1830, "gave to every settler on the public lands the right of preëmption of one hundred and sixty acres; yet, if a settler happened to be seated on a fractional section, containing less than that quantity, there is no provision in the act by which he could make up the deficiency out of the adjacent lands, or any other lands."

Did the location of Governor Pope, under the act of Congress, affect the claim of Cloyes? On the 15th of June, 1832, one thousand acres of land were granted, adjoining the town of Little Rock, to the Territory of Arkansas, to be located by the Governor. This selection was not made until the 30th of January, 1833. Before the grant was made by Congress of this tract, the right of Cloyes to a preëmption had not only accrued, under the provisions of the act of 1830, but he had proved his right, under the law, to the satisfaction of the register and receiver of the land office. He had, in fact, done every thing he could do to perfect this right. No fault or negligence can

be charged to him. In the case above cited from 3 Howard, the court say, — "The act of the 29th of May, 1820, appropriated the quarter-section of land in controversy, on which Etheridge was then settled, to his claim, under the act, for one year, subject, however, to be defeated by his failure to comply with its provisions. During that time, this quarter-section was not liable to any other claim," &c. And the supplement to this act, approved 14th July, 1832, extended its benefits. The instruction of the commissioner, dated September 14th, 1830, was in accordance with this view. He says, "It is, therefore, to be expressly understood, that every purchase of a tract of land at ordinary private sale, to which a preëmption claim shall be proved and filed according to law, at any time prior to the 30th of May, 1831, is to be either null and void, (the purchase-money thereof being refundable under instructions hereafter to be given,) or subject to any legislative provisions."

By the grant to Arkansas, Congress could not have intended to impair vested rights. The grants of the thousand acres and of the other tracts must be so construed as not to interfere with the preëmption of Cloyes.

The Supreme Court of the State, in sustaining the demurrers and dismissing the bill, decided against the preëmption right claimed by the representatives of Cloyes; and as we consider that a valid right, as to the fractional quarter on which his improvement was made, the judgment of the State court is reversed; and the cause is transmitted to that court for further proceedings before it, or as it shall direct, on the defence set up in the answers of the defendants, that they are *bonâ fide* purchasers of the whole or parts of the fractional section in controversy, without notice, and that that court give leave to amend the pleadings on both sides, if requested, that the merits of the case may be fully presented and proved, as equity shall require.

Mr. Justice CATRON, Mr. Justice NELSON, and Mr. Justice GRIER dissented. (See Appendix.)

### *Order.*

This cause came on to be heard on the transcript of the record from the Supreme Court of the State of Arkansas, and was argued by counsel. On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Supreme Court in this cause be, and the same is hereby, reversed, with costs, and that this cause be, and the same is hereby, remanded to the said Supreme Court, for further proceedings to be had therein in conformity to the opinion of this court.