Barnard's Heirs v. Ashley's Heirs et al.

Elizabeth J. Barnard, Mary A. Barnard, Corrine Barnard, William S. Barnard, and Thomas Barnard, infant children and sole Heirs of Thomas Barnard, deceased, by William Cannon, their Guardian and next Friend, Complainants and Appellants, v. Mary W. W. Ashley, Executrix, and William E. Ashley, and Frances A. Ashley, and Henry C. Ashley, an Infant, by Mary W. W. Ashley, his Guardian, Heirs, &c. of Chester Ashley, deceased, and Silas Craig's Representatives.

18h 43
L.-ed 285
20h 8
22h 203
2b 558
13wa 82
19wa652
112 56
38f 9

The act of congress passed on the 4th of July, 1836, (5 Stats. at Large, 107,) provided for a direct supervision by the commissioner of the general land-office over registers and receivers of the land-offices, and therefore their judgment is not conclusive in a case where additional proceedings were had before them in 1837.

The cases of Wilcox v. Jackson, 13 Pet. 511, and Lytle v. Arkansas, 9 How. 333, commented on and explained.

Where a survey was approved on June 4, 1834, a selection made, under the authority of congress, by Governor Pope, on June 6, 1834, the lands thus selected were not open to preëmptions under the act of June 19, 1834.

Where there was an erroneous survey, a selection of a section did not attach until a correct survey was returned, which was not until the 19th of July, 1834. As the preëmption law was passed on the 19th of June, 1834, an occupant of the selection would have had the better title, if he could have brought himself within the conditions of the law. But the evidence shows that he could not do so.

By the act of congress passed on January 6, 1829, (4 Stats. at Large, 329,) a donation claim could not be located upon land occupied by an actual settler. But in this case, the evidence shows that the land in question was not so occupied.

This was an appeal from the circuit court of the United States for the southern district of New York.

The case is stated in the opinion of the court.

It was argued by *Mr. Pike*, for the appellants, and by *Mr. Lawrence* and *Mr. Crittenden*, for the appellees.

The points of law made by the respective counsel were so interwoven with the facts, that they cannot be explained without an elaborate statement of the case.

Mr. Justice CATRON delivered the opinion of the court.

The proceedings in the court below consisted of a bill filed by Barnard against Ashley and Craig, praying that certain patents for lands issued to the defendants might be decreed to be cancelled, upon the ground of a violation of preëmption rights on part of the complainant, to the following tracts, namely: N. E. $\frac{1}{4}$ and S. W. fr. $\frac{1}{4}$ of sec. 27; S. E. fr. $\frac{1}{4}$ of sec. 28, T. 18 S., R. 1 W.; S. W. fr. $\frac{1}{4}$ of sec. 15, T. 19 S., R. 1 W.; S. E. $\frac{1}{4}$ of sec. 22, T. 18 S., R. 1 W.; and a cross-bill on part of Ashley to be quieted in his title to the S. E. qr. of sec. 22, against the right set up by Barnard to that tract, under a junior

patent therefor, upon the ground that Barnard had no right to this tract, and that the patent was issued to him improperly.

The title of Ashley and Craig (the appellees) to the first four tracts is derived from a sale to them of the land in controversy by the governor of Arkansas, in consequence of a selection made by him of the land under certain provisions of the acts of congress of the 2d of March, 1831, and the 4th of July, 1832, (4 Stats. at Large, 473, 563,) upon which selection and sale patents were issued by the United States. The title to the S. E. ¼ of sec. 22, T. 18 S., R. 1 W., is derived from the location of what is called a "Lovely donation claim" on this quarter section, by virtue of the provisions of the 8th section of the acts of the 24th of May, 1828, (4 Stats. at Large, 306,) and 6th of January, 1829, (Ibid. 329.)

According to the conceded facts, it is insisted, on the part of Ashley and Craig, that the register and receiver having, on due proof and examination, rejected Barnard's claims to a preference of entry of the four quarter sections, he is thereby concluded from setting them up in a court of equity, because the register and receiver acted in a judicial capacity, and their judgment, being subject to no appeal, is conclusive of the claim. And the cases of Jackson *v.* Wilcox, and Lytle *v.* The State of Arkansas are relied on to maintain this position.

In cases arising under the preëmption laws of the 29th of May, 1830, and of the 19th of June, 1834, the power of ascertaining and deciding on the facts which entitled a party to the right of preëmption was vested in the register and receiver of the land district in which the land was situated, from whose decision there was no direct appeal to higher authority. But, even under these laws, the proof on which the claim was to rest was to be made "agreeably to the rules to be prescribed by the commissioner of the general land-office;" and, if not so made, the entry would be suspended, when the proceeding was brought before the commissioner by an opposing claimant. In cases, however, like the one before us, where an entry had been allowed on *ex parte* affidavits, which were impeached, and the land claimed by another, founded on an opposing entry, the course pursued at the general land-office was to return the proofs and allegations, in opposition to the entry, to the district office, with instructions to call all the parties before the register and receiver, with a view of instituting an inquiry into the matters charged; allowing each party, on due notice, an opportunity of cross examining the witnesses of the other, each being allowed to introduce proofs; and, on the close of the investigation, the register and receiver were instructed to report the proceeding to the general land-office, with their opinion as to the effect of the proof,

and the case made by the additional testimony. And, on this return, the commissioner does in fact exercise a supervision over the acts of the register and receiver. This power of revision is exercised by virtue of the act of July 4, 1836, § 1, which provides "that, from and after the passage of this act, the executive duties now prescribed, or which may hereafter be prescribed by law, appertaining to the surveying and sale of the public lands of the United States, or in anywise respecting such public lands; and also such as relate to private claims of land, and the issuing of patents for all grants of land under the authority of the government of the United States, shall be subject to the supervision and control of the commissioner of the general land-office, under the direction of the President of the United States." The necessity of "supervision and control," vested in the commissioner, acting under the direction of the President, is too manifest to require comment, further than to say that the facts found in this record show that nothing is more easily done than apparently to establish, by *ex parte* affidavits, cultivation and possession of particular quarter sections of land, when the fact is untrue. That the act of 1836 modifies the powers of registers and receivers to the extent of the commissioner's action in the instances before us, we hold to be true. But if the construction of the act of 1836, to this effect, were doubtful, the practice under it for nearly twenty years could not be disturbed without manifest impropriety.

The case relied on, of Wilcox v. Jackson, 13 Pet. 511, was an ejectment suit, commenced in February, 1836; and as to the acts of the register and receiver, in allowing the entry in that case, the commissioner had no power of supervision, such as was given to him by the act of July 4, 1836, after the cause was in court.

In the next case, 9 How. 333, all the controverted facts on which both sides relied had transpired, and were concluded before the act of July 4, 1836, was passed; and therefore its construction, as regards the commissioner's powers, under the act of 1836, was not involved. Whereas, in the case under consideration, the additional proceedings were had before the register and receiver in 1837, and were subject to the new powers conferred on the commissioner.

In Lytle's case, we declared that the occupant was wrongfully deprived of his lawful right of entry, under the preëmption laws, and the title set up under the selection of the governor of Arkansas was decreed to Cloyes, the claimant, this court holding his claim to the land to have been a legal right, by virtue of the occupancy and cultivation, subject to be defeated only by a failure to perform the conditions of making proof and tendering the

purchase-money. There the facts were examined to ascertain which party had the better right; and, following out that precedent, we must do so here.

Governor Pope was authorized to select lands equal to ten sections in the Territory of Arkansas, in tracts not less than a quarter section each, and to sell the same for the purpose of raising a fund to erect public buildings in the territory. The three first-named quarter sections lie in township 18, the survey of which was made and returned to the local land-office, and approved June 4, 1834, when the lands therein were subject to entry by the governor.

He made his final amended selections of the three tracts in township 18, June 6, 1834. The bill claims title to these tracts under the occupant law of June 19, 1834. As Governor Pope's assignees, Craig and Ashley had a vested right when the act of June 19 was passed; it did not operate on these lands, which were appropriated to the use of the United States; and patents for them were properly awarded to the purchasers from the governor.

The condition of the S. W. quarter of sec. 15, T. 19, differs from the preceding lands in this: the township survey of No. 19 was found to be inaccurate when first returned to the land-office at Little Rock, and a resurvey was ordered as to some of the section lines, which were not finally adjusted till the 19th of July, 1834.

Governor Pope had selected the S. W. quarter of sec. 15 on the 29th of May preceding, relying on the inaccurate survey; and it is insisted for Barnard's heirs, that the selection was invalid, as it could not be made of unsurveyed lands; and that township No. 19 could not be legally recognized as surveyed, until the survey was settled and adopted by the surveyor-general of the district.

Our opinion is, that the selection could only take effect from the 19th of July, 1834, when the township survey was sanctioned, and became a record in the district land-office. As the occupant law passed June 19, 1834, Barnard's assignor, Richmond, could lawfully enter the quarter section, if he had occupied the same as required by law; that is to say, if he was in possession when the act was passed, and cultivated any part of the land in the year 1833.

The bill alleges that Richmond occupied the quarter section June 19, 1834; that he had cultivated the same in 1833, and made due proof of his right of preëmption.

It is further alleged, that on the 20th day of January, 1834, some five months before the occupant-law was passed, Barnard purchased from Richmond the quarter section in dispute, and

took his title bond for a conveyance when Richmond should obtain a patent for the land; and by force of this bond the bill prays to have the patent to Craig and Ashley adjudged to have been for Barnard's benefit, and that the land be decreed to Barnard's heirs.

The act of 1834 revived the act of 29th of May, 1830, "to grant preëmption rights to settlers." That act provides, (§ 3,) "that all assignments and transfers of rights of preëmption given by this act, prior to the issuing of patents, shall be null and void." .

The act of January 23, 1832, allowed a transfer of the certificate of purchase. Here, however, the assignment was made in January, 1834, when no law allowing of a preference of entry existed; but, as no reliance seems to have been placed in the pleadings on this ground of defence, we will not rest our decree on it.

As respects Richmond's occupation according to the act of 1834, John Monholland, Edward Doughty, and Daniel Kuger each swear, in similar language, "that Richmond, in the year 1833, cultivated part of the S. W. fractional quarter, sec. 15, in T. 19 S., R. 1 W. of the principal meridian, and raised a corn crop on the same in that year, (1833,) and was in possession of the same on the 19th day of June, 1834." Kuger says Richmond had his dwelling-house on the quarter section, and resided there on the 19th of June, 1834.

Jacob Silor, examined on part of the respondents, Ashley and Craig, states that he resided on Grand Lake, quite near the quarter section in dispute, since 1830. He says: " In February, 1833, when I arrived on the aforesaid lake, there was a turnip-patch on the southwest fractional quarter of fractional section 15, in township 19 south, of range 1 west, claimed by one Edward Doughty, which I believe he abandoned in consequence of the location of the ten-section claim on the land. After Doughty left the aforesaid fractional quarter, William Richmond, in December, 1833, built a cabin where the turnip-patch claimed by the said Edward Doughty was made, and planted some eschallots. The aforesaid William Richmond lived in the same township, on the Mississippi River, on the lands owned by Mr. Cummins or Mr. Shaw, on the 19th of June, 1834; and never did live on section 15, from the time I went on the lake to the present day."

Benjamin Taylor deposes, that he settled with his negroes on township 18, in February, 1834; that in the spring of that year he examined with care the several tracts of land of Ashley and Craig, with a view to purchase them; and, being asked what the situation of the southwest quarter of section 15 was, when

he examined it, answers, that "there was a small burn of cane, perhaps twenty yards square, uninclosed, without the appearance of ever having been cultivated, and no house was thereon." We suppose that it had been burnt up by fire in the woods, or removed during the winter of 1833, 1834.

We hold the truth to be, that Richmond built a cabin in 1833, and in January, 1834, sold out his improvements to Barnard and removed away, and resided elsewhere in June, 1834, and consequently was not entitled to a preference of entry.

The next subject of controversy is the S. E. qr. of sec. 22, T. 18. Ashley, by cross-bill, prayed to have his title quieted to this quarter section against Barnard's heirs, and the circuit court granted him the relief he asked.

The half of section 22 was entered by Ashley on a floating warrant, known as a Lovely claim. By the act of January 6, 1829, no one was permitted to enter the improvement of an actual settler in the territory, by virtue of such floating warrant; and it is alleged that Barnard was such an actual settler, and had an improvement on the S. E. qr. sec. 22, T. 18, before Ashley entered it.

The cross-bill alleges that Barnard had improvements on sec. 23, but that they did not extend to the S. E. qr. of sec. 22 previous to the 4th of June, 1834, when Ashley entered the land. It was shortly before that time that Martin had corrected the eastern boundary of sec. 22, locating it about one hundred yards further west, and which was adopted as the true line at the land-office. In support of the bill, Benjamin Taylor deposes, as already stated, that he removed to the immediate neighborhood of the lands in dispute in February, 1834, when he examined the half sec. 22, with a view to purchase it from Ashley. He states that Thomas Barnard cultivated the S. W. qr. of fractional sec. 23, in 1834; but that his cultivation and improvement did not extend to the south half of sec. 22, nor had any other person residence or cultivation thereon.

Philip Booth states that Barnard showed him (Booth) an improvement on the S. E. qr. of sec. 22 early in 1834; thinks it was an extension of his farm of two or three acres. It had been cleared the year before; but there was no cultivation. The witness does not recollect whether the clearing extended beyond the old line or the new one.

Silas Craig, who was a competent witness for Ashley in this separate proceeding, deposes that he was with Martin, the surveyor, when the lines were run and adjusted, late in February, 1834; that the new and proper line bounding the section east is about one hundred yards west of the first line, which was rejected by the surveyor-general; that when he was at the southeast cor-

Barnard's Heirs *v.* Ashley's Heirs et al.

ner of the section, he examined Barnard's improvement, and ascertained that it did not extend west to the new line at any place. He seems to have made it his business to see if the improvement of Barnard extended to the S. E. qr. in dispute.

Romulus Payne was called on to prove the value of mesne profits and improvements; he says that Barnard commenced the cultivation on the S. E. qr. of sec. 22, in 1837.

John Monholland, Edward Doughty, and several other witnesses, swear on behalf of the defendants to the cross-bill, in general terms, that Barnard had possession of the S. E. qr. sec. 22, on the 19th of June, 1834, and that he had an improvement on part of it in 1833.

Barnard, in proving up his preëmption right, swore that he was cultivating the quarter section in 1833, and in possession on the 19th June, 1834. And this affidavit is indorsed by two witnesses, Harrison and Butler, who merely say that they have heard Barnard's affidavit read, and that it is true.

So, likewise, Jacob Silor indorsed William Richmond's affidavit, made before a justice of the peace, and intended to secure a preference of entry for Barnard in Richmond's name, and which was declared sufficient by the register and receiver; and yet, when Silor was reëxamined as a witness in this cause, he conclusively proved that Richmond left the land, and resided elsewhere when the occupant law of June 19, 1834, was passed.

The *ex parte* affidavits of Butler and Harrison, and those of Monholland and Doughty, were obviously written out for them to swear to as matter of form, but made with so little knowledge, on part of the witnesses, of the section lines, and the number of quarter sections on which they deposed improvements existed in 1833 and 1834, as to be of little value. And the same may be safely said of other witnesses whose affidavits were taken without cross-examination.

It is most obvious that these loose affidavits obtained by the interested party have been made, as to the improvement being on the quarter section claimed, on the information of him who sought the preference of entry; the witnesses not knowing, of their own knowledge, where the true section line was, over which they swear Barnard's improvement extended in the year 1833.

When the last examination was had before the register and receiver in 1837, Barnard's own witnesses, Philip Booth and John F. Harrison, swore the facts to be, that Barnard had " deadened the timber and cleared away the cane;" on a part of S. E. qr. sec. 22; that he fenced it early in 1834, and made a crop of corn on it that year, and was in possession June 19, 1834. Booth, in a subsequent affidavit, contradicts his first statement. That there was no cultivation on the quarter section in 1833,

we think is satisfactorily established; nor had Barnard any right to enter it. And such was the final opinion of the register and receiver, which the, commissioner of the general land-office reversed, and ordered a patent to issue to Barnard.

The circuit court were obviously of opinion, as appears from the decree it made, that Craig and Taylor's evidence established the fact that Barnard had no part of the quarter section in possession in 1833 or 1834, and hence decreed for the complainants in the cross-bill. And, in the doubtful state of the evidence, we are not prepared to say that this court can hold otherwise, and, therefore, affirm the decree, and order the cause to be remanded for further proceedings, as respects the profits and improvements.