# REPORTS OF CASES

DETERMINED IN

# THE SUPREME COURT,

## JULY TERM, 1869.

ROBERT T. HUTTON *v.* JOHN B. FRISBIE, C. J.
MOSELEY, ISAAC M. RUTTON, E. FRISBIE, AND
J. B. THOMAS.

ACT OF CONGRESS IN RELATION TO SOSCOL RANCHO.—The Act of Congress of
March 3d, 1863, entitled "An Act to grant the right of pre-emption to certain
purchasers on the Soscol Rancho, in California," provided that it should be law-
ful for individuals, *bona fide* purchasers from Vallejo, or his assigns, of land on
said rancho, to enter at one dollar and twenty-five cents per acre said land so
purchased, to the extent to which each had reduced it to possession. Said rancho
was claimed by Vallejo under a Mexican grant which had been rejected by the
Supreme Court of the United States. *Held,* that the said Act describes the
specific tract of land which each individual purchaser from Vallejo is entitled to
enter, and for that reason does not come within the rule laid down in *Chotard* v.
*Pope,* 12 Wheaton, 587, that when a party is authorized by Act of Congress
generally to enter a given quantity of land within larger boundaries, he cannot
take lands upon which a pre-emption or some other right has attached. *Held,* fur-
ther, that said Act withdraws the lands which had been purchased *bona fide* from
Vallejo and reduced to possession from the operation of the general pre-emption
laws, and gives such purchasers and possessors a right to enter the same as
against one who had taken steps to become a pre-emptor on the same, under the
general pre-emption laws, before the passage of said Act. *Held,* further, that
said Act did not confine purchasers from Vallejo, or their assigns, to one hundred
and sixty acres, but allowed them to enter to the extent of the possession of each.

WITHDRAWING LAND FROM PRE-EMPTION.— Congress has the power, at any time after a settler has moved upon and taken the prescribed steps to acquire a pre-emption right to land, but before he has perfected his right by payment, to withdraw the land from the operation of the general pre-emption laws, and deprive the settler of a right to perfect his claim and enter the land, and confer a right of entry upon another

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

The plaintiff averred in his complaint that on the 16th day of November, 1862, he entered and settled upon a tract of land described as the Southwest Quarter of Section Twenty-five, in Township Four North, in Range Four West, of Mount Diablo meridian, in Napa County, California, and that said land was a part of what was formerly known as the Soscol Rancho, and which was claimed under a pretended Mexican grant by M. G. Vallejo, but which grant had been rejected by the Supreme Court of the United States, March 24th, 1862; and that by virtue of said decision the land became a part of the public domain, subject to settlement and pre-emption. That at the time of plaintiff's settlement he was qualified in every respect to pre-empt the same under the laws of the United States, and entered as a pre-emptor and erected a dwelling house thereon, and resided in it from November 16th, 1862, until December 1st, 1862, when he was forcibly ejected by the procurement of the defendants, and since has been deterred by threats and fears of bodily harm from continuing his settlement and improvements. That plaintiff and other settlers on the rancho, about the 1st of September, 1862, paid into the proper place of United States depository a sum sufficient to pay for a survey of the same, and that at their request the survey was made. That on March 3d, 1863, Congress passed a special Act, entitled "An Act to grant the right of pre-emption to certain purchasers on the Soscol Rancho, in California." That the Commissioner of the Land Office, after the passage of said Act, instructed the Register and Receiver in the local district to investigate the facts concerning the settlement and

pre-emption of plaintiff and other settlers prior to the passage of said Act of March 3d, 1863, and they did so investigate and reported, and plaintiff made proof to their satisfaction that he had performed all acts necessary to make him a pre-emptioner; but that they reported to the Commissioner their opinion that the Act of March 3d, 1863, withdrew the land from the operation of the general pre-emption laws, and for that reason refused to permit the plaintiff, although he offered to do so, to proceed any further in the establishment of his pre-emption rights.    That on the 16th day of September, 1863, the plat of the public survey of said township was filed in the local Land Office with the Register thereof, and that on the 17th day of September, 1863, the plaintiff filed with the Register his declaratory statement; and that afterwards, on the 26th day of June, 1864, full and complete proofs were taken by said Register and Receiver to their satisfaction, showing that plaintiff was entitled to enter said land as a pre-emptioner, and that the plaintiff then filed all the affidavits and proofs required by law, paid the Register and Receiver their fees for taking proofs and affidavits and filing the same, and has since been and still is ready and anxious to enter the land and pay the price required by law to entitle him to a patent.    That after taking said proofs the Register and Receiver refused to allow the plaintiff to enter the land, but that plaintiff made them a tender of the money to pay for the land, but was refused.    That after the said investigation was made and proofs were taken, and after the passage of the Act of March 3d, 1863, the defendants, as purchasers from Vallejo, entered and were about to receive a patent for the land.    The prayer was that the defendants be enjoined from selling and conveying the land, and be declared to hold the same in trust for the plaintiff, and might be compelled to convey the same to the plaintiff upon payment of the purchase money, with proper costs and charges.

The defendants demurred to the complaint.    The Court sustained the demurrer, and the plaintiff declining to amend,

gave judgment that the plaintiff take nothing by his suit. The plaintiff appealed.

The other facts are stated in the opinion of the Court.

*Thompson Campbell, John B. Felton,* and *Theodore H. Hittell,* for Appellant.

Courts of justice have power to examine contested claims to a right of entry under the pre-emption laws of the United States, and to overrule the decisions of the Register and Receiver. (*Garland* v. *Wynne,* 20 How. 8; *Lytle* v. *The State of Arkansas,* 9 How. 328; *Cunningham* v. *Ashley et al.,* 14 How. 377; *Barnard's Heirs* v. *Ashley's Heirs,* 18 How. 44; *United States* v. *Gear,* 3 How. 120; *McAfee* v. *Keirn,* 7 S. & M. 780.)

Pre-emption rights constitute property, and attach to the land from the commencement of a settlement thereon, and the Courts enforce this right though the Executive Departments may have rejected it, and sold the land to which it was attached to other parties, according to other laws. (See authorities above cited.) The Act of March 3d, 1863, is a private Act, and if the words are ambiguous or admit of different meanings, that meaning which is favorable to public interest should be adopted. (*Litchfield* v. *Dubuque and Pacific Railroad Co.,* 23 How. 88.) It is a pre-emption law, and must therefore be construed in conformity with that system of laws. Congress will be presumed to have intended to confine their grant of pre-emption to land on the Soscol Rancho, which, at the time of making such grant, was open either to pre-emption or to sale. (*Chotard* v. *Pope,* 12 Wheat. 586.) The Act of 1863 did not, by implication or otherwise, repeal the pre-emption law of 1841, but the same was and still is in full force, and both must be construed together. (*United States* v. *Gear,* 3 How. 131.) The Act of 1863 is constitutional, if construed to embrace lands not already disposed of by pre-existing laws; but if it be construed to embrace all lands in the Soscol Rancho, without regard to

antecedent rights of any kind, then the Act is unconstitutional, because it would be an infringement upon private rights. The laws upon the subject of the public lands are all in *pari materia*, and are to be construed together. (2 Wirt's Opins. 46.)

The claim of pre-emption is a legal right, subject to be defeated only by a failure to perform the conditions annexed. (*Lytle et al.* v. *The State of Arkansas et al.*, 9 How. 333; *McAfee* v. *Keirn*, 7 S. & M. 788.) From the time a tract of land has once been legally appropriated to any purpose, it is severed from the mass of the public lands; and no subsequent law, or proclamation, or sale would be construed to embrace it, although no reservation were made of it. ( *Wilcox* v. *Jackson*, 13 Pet. 513; *The United States* v. *Fitzgerald*, 15 Pet. 420.) The policy of the General Government recognizes the superior equity of pre-emption settlers to become the purchasers of a limited extent of land, comprehending their improvements, over that of any other person. (*Clement* v. *Warner*, 24 How. 397.) The officers of Government should give the patent to him who by law is entitled to it, and if they give it to another, he is a trustee for the true owner. (See *Starks* v. *Mather*, 1 Walk., Miss., 193; *McAfee* v. *Keirn*, 7 S. & M. 780; *Cunningham* v. *Ashley et al.*, 14 How. 377.)

*Patterson, Wallace & Stow*, for Respondents.

The public domain cannot be disposed of except in pursuance of an Act of Congress. (Constitution, Art. IV, Sec. 3; *Wilcox* v. *Jackson*, 13 Peters, 498; *Menard's Heirs* v. *Massey*, 8 How. 293.) All that plaintiff acquired by settling upon the land under the law then in force was: first, as against the Government he was not a trespasser; second, the right to *purchase* in preference to others *when the land should be sold.* This right was a mere privilege, which he was under no obligation to avail himself of. He had entered into no contract to purchase, and he had not obtained the consent of the Government to sell.

The plaintiff's right to settle upon the land, *and thereafter to purchase, when* the Government determined to sell it, was founded wholly upon the Act of 1841. (Lester's L. L. 59, and the Act of May 30th, 1862, 12 U. S. S. at Large, p. 410.) Until entry and payment for the land, Congress had an undoubted right to repeal the statute of 1841, or to grant or provide for the grant of the lands to defendants, or reserve the same for military purposes. (*Matthews* v. *Zane*, 7 Wheat; *Groom* v. *Hill*, 9 Mo. 323; 8 Opins. Attorney General; 2 Opins. Attorney General, 371; *Hanlon* v. *Perry*, 9 Mo. 804.)

The Acts of 1841 and 1862 only authorize settlement on unsurveyed land without being a trespasser, with a right in the settler to remain until a survey, or until Congress passes some Act to the contrary. But until actual payment and patent issued, he has no estate in the lands; he could not cut timber until patent issued. (2 Opins. Attorney General, 525; 4 Opins. Attorney General, 405, 493; *Burgess* v. *Gray*, 16 How.; *Brown* v. *Throckmorton*, 11 Ill. 530; 8 S. & M. 234.)

It appears from the complaint, and such is the fact, that after the plat was returned to the Register and Receiver, defendants undertook, under said "Soscol Act," to enter and purchase the land in controversy, and plaintiff attempted to do so under the Act of 1841. Both made proofs; both were heard. Plaintiff was adjudged not to be entitled to enter by the Register and Receiver, and by the Commissioner of the General Land Office. This was a matter exclusively within the control and jurisdiction of those officers, and their decision is final and conclusive, and cannot be reversed by the Courts. (*Landes* v. *Brant*, 10 How. 348, 370; *Menard's Heirs* v. *Massey*, 8 How. 293; *Wilcox* v. *Jackson*, 13 Peters, 498; *Doe* v. *Bruden*, 16 How. 635, 637; *Les Bois* v. *Bramell*, 4 How. 449, 461.)

By the Court, SAWYER, C. J. :

The questions arise upon demurrer to the complaint. The following and other subordinate facts are alleged. The allegations, for the purposes of our decision, must be assumed to be true.

On the 24th of March, 1862, the claim to the Soscol Rancho, under the Mexican grant to Vallejo, was rejected by the Supreme Court of the United States, and thereafter, till the passage of the Act of 1863, hereinafter considered, the lands embraced in said rancho, for the purposes of this decision, will be regarded as a part of the public domain of the United States to which the pre-emption laws applicable to the State of California extended.   On the 16th of November, 1862, the plaintiff entered upon the Southwest Quarter of Section Twenty-five, Township Four North, Range Four West, of Mount Diablo meridian and base, being in the County of Napa, and a part of said Soscol Rancho claimed under said grant.   He claimed a pre-emption right under the laws of the United States, and, being competent to acquire such right, performed and offered to perform all the conditions prescribed by those laws, so far as they could then be performed.   Some two weeks afterward, on the 1st of December, 1862, he was ejected from said premises by force by the defendants, who are purchasers under Vallejo, and he has, since been deterred by threats from continuing his settlement and improvements.

On the 3d of March, 1863, Congress, at the solicitation of defendants and other purchasers from Vallejo, the grantee in said rejected grant, passed a special Act, entitled " An Act to *grant the right of pre-emption* to certain purchasers on the Soscol Rancho in California."   Under this Act, the Register and Receiver of the Land Office took testimony as to the settlement and right of pre-emption of the several parties, including plaintiff, and determined their rights; and, on appeal the Secretary of the Interior finally decided, that

the said Act of March 3d, 1863, withdrew the said lands, embraced in the Soscol Rancho, from the operation of the general pre-emption laws of the United States, and conferred the right of pre-emption to said lands upon the purchasers under Vallejo, claiming title under said rejected grant; and the defendants thereupon entered the said lands so claimed by them, and were about to receive a patent from the United States for the same, including the *locus in quo*, under the provisions of said Act of 1863.

The plaintiff, claiming to have acquired a pre-emption right under the general pre-emption laws before the passage of said Act of 1863, thereupon brought this suit, particularly setting forth in his complaint the foregoing and other minor facts, and asked that defendants might be restrained from selling or conveying any portion of said land; that he be adjudged to hold the same in trust for the benefit of plaintiff, and required to convey the same upon payment of the purchase money required by law, and that plaintiff be restored to the possession, etc.

The contest, therefore, arises under the general pre-emption laws of the United States, under which the plaintiff claims, and the said special Act of March 3d, 1863, giving a special right of pre-emption for a period of twelve months after the return of the surveys to the *bona fide* purchasers from Vallejo, and their assigns, to the extent of the land which they have reduced to possession.

Two questions arise: Firstly—Does the Act of 1863 attempt to withdraw from the operation of the general pre-emption laws those lands upon which other parties after the rejection of the grant and before the passage of said Act had entered and made pre-emption claims, in accordance with the general pre-emption laws of the United States, and confer the pre-emption right to such lands upon the purchasers from Vallejo? And secondly—If so, has Congress the power to so withdraw such lands, and cut off the pre-emption right after its inception, but before perfected by payment, and confer the right upon the purchasers from Vallejo?

These are the two questions presented for our consideration, and relied on by the appellant, and we are of the opinion that both must receive an affirmative answer.

The circumstances under which the Act of Congress in question was passed are perfectly notorious, and constitute a part of the history of the State. Eighteen square leagues of land, known as the Soscol Rancho, were claimed under a Mexican grant to Vallejo. It had been divided up and conveyed and reconveyed in numerous parcels to large numbers of citizens of California, who had, to a large extent, reduced it to possession, cultivated it, placed upon it extensive and valuable improvements, and made it the permanent homes of themselves and their families, under the idea that they had a good title. Within its limits were the United States Navy Yard at Mare Island, and the depot and extensive works of the Pacific Mail Steamship Company; and two considerable cities had grown up on it, each of which had successively been the capital of the State of California—the inhabitants being purchasers and claimants under Vallejo. A large portion of the inhabitants of one populous county and of portions of another claimed under, and relied on, title derived from Vallejo. After said lands had thus been occupied and improved, and large portions of them been conveyed and reconveyed for upwards of fifteen years, and the value been largely enhanced by the labor and money of those who thus claimed, in good faith, the grant, after having been confirmed by the Board of Land Commissioners, and the decree of confirmation affirmed by the District Court of the United States on appeal, was in 1862 rejected by the Supreme Court of the United States, which rejection had the effect, in the sorrowful, but forcible, and unfortunately too true language of Mr. Justice Grier, "to confiscate the property of some thousands of our fellow citizens who have purchased under this title and made improvements to the value of many millions, on *suspicion first raised here* as to the integrity of a grant universally acknowledged to be genuine in the country where it originated." (*United States* v.

*Vallejo*, 1 Black, 555.) The obvious remedy for this whole-sale confiscation did not escape the learned Justice named, for in the same opinion he expresses the hope, destined soon after to be realized in the passage of the said Act of 1863, "that Congress will not suffer the very numerous purchasers to forfeit the millions expended on the faith of the treaty obligations." (*United States* v. *Vallejo*, 1 Black, 558.)

Soon after the rejection of the grant a multitude of people rushed upon the lands which their neighbors had bought, paid for, improved, occupied, and cultivated for many years, and set up claims to one hundred sixty acres each, under the pre-emption laws of the United States. It was in view of this condition of things, which is notorious in the political, civil, and judicial history of the State, that the Act of Congress of March 3d, 1863, was passed, and in the light of these surrounding circumstances must it be construed. The Act is entitled "An Act to grant the right of pre-emption to *certain purchasers* on the Soscol Rancho in California." Section one provides for extending the lines of the public surveys over the rancho. Section two, "that after the return of such approved plats to the district office, it may and shall be lawful for individuals, *bona fide* purchasers from said Vallejo, or his assigns, to enter, according to the lines of the public surveys, at one dollar and twenty-five cents per acre, the land so purchased, to the extent to which the same had been reduced to possession at the time of said adjudication of the Supreme Court, joint entries being admissible by coterminous proprietors to such extent as will enable them to adjust their respective boundaries." Section three provides for the *municipal* claims of the two cities situate on the rancho. Section four, for presenting the claims to the Register and Receiver within twelve months after the return of the surveys, "accompanied by proof of *bona fide* purchase under Vallejo, of settlement, and the extent to which the tracts claimed had been reduced into possession at the time of said adjudication." Section five provides that such claims as shall not be presented within twelve months "shall be

barred, and the lands covered thereby with any other tracts within the limits of said Soscol Rancho, the titles to which are not established under this Act, shall be dealt with as other public lands." Then it prohibits the entry of lands reserved for public uses, etc. (12 U. S. Stats. at Large, 808.)

We shall freely admit, that, where the language of a private Act is doubtful or ambiguous, or admits of different meanings, that construction will be adopted which is most favorable to the public interests. We do not question the authorities cited on that point. But, in this case, we fail to perceive wherein the meaning of the statute in question, viewed in the light of the condition of things which induced its passage, is doubtful or ambiguous, or how the public interests will be promoted by allowing strangers, under the cloak of a law, the general letter of which, but not the spirit, by accident extends to a case which it would be a libel upon Congress to intimate, or for a moment suppose was ever intended to be embraced in its provisions, to intrude upon lands which others have cultivated and improved for many years, under the belief that they had a good title, protected by the solemn treaty of the Federal Government, and for which they have paid the full value, and to enter the same at a very small fraction of the present value given to it by such labor of others, rather than the party who has honestly labored upon and improved it, and by his labor and money imparted to it by far the greater portion of that present value. Nor do we question the rule adopted in *Chotard* v. *Pope*, 12 Wheat. 587, and *Lytle* v. *The State of Arkansas*, 9 How. U. S. 333, to the effect that when a party is authorized by an Act of Congress generally to enter "in any land office," etc., "a quantity of land not exceeding," etc., he must be limited in his selection to lands subject to location, and cannot take lands already sold, or reserved from sale, or upon which a pre-emption, or some other right, has attached under a law, which is still in force, and which "covers" and protects it. The rule is obviously sound. It cannot for a moment be supposed that Congress, by such general Acts,

contemplated that the party should be authorized to take land upon which other parties had already entered and taken steps to acquire it, and were diligently pursuing their rights under Acts *still in force* with reference to that land, or that it intended in this general way to repeal such Acts. The two Acts in such cases are not necessarily inconsistent, and can be so construed in the mode adopted by the Court as to stand together; and in such cases it is obviously the duty of the Court so to construe them. But such is not the case with the Act we are now considering. We have already seen the condition of things which demanded the special remedy that was promptly given. A large number of citizens, who had paid those supposed to have the title under the Mexican grant and stipulations of the treaty with Mexico for the lands, who had spent years in improving them, were likely to be turned out by others, who, disregarding their equities, entered upon their cultivated fields, and availed themselves of the labors of such purchasers, under the cover of the general pre-emption laws, which, by their general terms, unfortunately embraced a case, as general laws sometimes necessarily do, never contemplated by Congress, and to the extent of the *bona fide* purchase, at least, never could by any possibility have been contemplated by any wise or just legislative body. The policy of the pre-emption laws was undoubtedly beneficent. They were intended to give those who were pioneers in the unsettled wilds of the public domain the first right to purchase the unoccupied lands which they have had the courage and hardihood to settle, and it will always be our pleasure as well as duty to extend to all such the utmost protection justified by the laws of the land. But this beneficent policy has no element in harmony with the principle that impelled men to rush in upon the improved possessions, and avail themselves of the labor of their neighbors, under the condition of things connected with the Soscol Rancho. The equities which lay at the foundation of the pre-emption policy were, in this particular instance, not with those who entered upon the possessions

of such of their neighbors as were honest purchasers; but they were all, and even equities of a much higher obligation, with the purchasers in good faith, who were not merely pioneers, who had crossed the continent in search of homes, but, also, parties, who had paid for their lands, and long occupied and improved them, under the belief that they had a good title; and Congress hastened to recognize and give effect to those equities by passing the Act in question.

The object to be accomplished, was, to give those parties who had once paid for their lands the first right to purchase from the Government, at the usual price the lands which they had before actually purchased and paid for in good faith, to the extent to which they had reduced them to possession before their title had been declared void by the Supreme Court. To this end it was provided, that, "it may and shall be lawful for individuals, *bona fide* purchasers from Vallejo or his assigns, to enter, according to the lines of the public surveys, at one dollar and twenty-five cents per acre, the land so purchased, to the extent to which the same had been reduced to possession at the time of said adjudication," etc.

We cannot presume that Congress was unaware that others had, before the passage of the Act, entered upon the former possessors with a view of acquiring the lands by pre-emption. We must presume that that body performed its great public duty, and informed itself fully of the true condition of things before taking final action upon a matter of so great public, as well as private, concern. Is it possible to doubt, in view of the condition of things which called for such legislation, and of the language of the Act passed, so well adapted to the exigencies of the case, that it was intended to give to the *bona fide* purchasers from Vallejo, and nobody else, the right to enter the lands so purchased to the full extent to which they had reduced them to possession at the time of the adjudication by the Supreme Court, provided they proceeded to perfect their right in the mode and within the time prescribed? Or could Congress, with any show of

justice, or decency, have done less? Others may doubt, but we cannot. The language is its own interpreter. It could not well be plainer. The next section is in strict harmony with this view. It directs the claimants under the Act, within a specified time, to present their claims, "accompanied by proof of *bona fide* purchase under Vallejo, of settlement and the *extent to which the tracts claimed had been reduced to possession at the time of the adjudication.*" Why this specific pointing out of the land, and requiring proof as to the extent of the possession, if, when so proved, it was not intended to allow an entry of the land, and of the whole so purchased, settled, and actually possessed? The language is special, and directed to particular individuals and specific lands, and it must be presumed that Congress intended that any prior general laws in conflict with its provisions must yield.

If Congress, instead of describing the land with reference to these defendants, in the language used in the Act, had said it may and shall be lawful for John B. Frisbie to enter, at one dollar twenty-five cents per acre, the southwest quarter of Section Numbered Twenty-five, in Township Numbered Four North, Range Numbered Four West, of Mount Diablo meridian and base, in the County of Napa and State of California, we apprehend that it would not have been contended that Congress did not intend to allow Frisbie to enter that particular piece of land, even if somebody else had, before the passage of the Act, gone upon it with a view of acquiring a pre-emption right. There would have been no possible room for doubt, because the equities in his favor entitled him to the consideration of Congress, and he was authorized, in accordance with such equities, to enter that specific piece of land. There would be no chance for selection. He must enter that and nothing else, and it would only be necessary to apply the description to the land to ascertain what specific tract of land was intended. But the description in the Act is just as specific as it is. The party who is entitled to enter the land must be a "*bona fide* purchaser from Vallejo, or his assigns," and the land which he

is authorized to enter, is, "the land so purchased to the extent to which the same had been reduced to possession at the time of said adjudication of said Supreme Court." We have only to apply these descriptions by ascertaining who is a *bona fide* purchaser from Vallejo, what land he purchased, and to what extent he had reduced it to possession at the time specified, and we have the party who is entitled to purchase, and the specific piece of land which he is entitled to enter, and he is entitled to enter no other under the Act. There is no opportunity for selection. The statute has made the selection for him. The description is just as specific as the one indicating the land as a certain quarter section, describing by number, township, and range. The language of the Act is not open to construction as to what land may be entered, and the difference between this case and those of *Chotard* v. *Pope*, and *Lytle* v. *State of Arkansas, supra*, where the parties were entitled to select lands from a much larger portion of the public domain, is so obvious that argument can scarcely make it appear more plain. Where an Act authorizes a party to enter any thousand acres of land he may select within specified exterior boundaries containing one hundred thousand acres, or in a whole State, and it happens that the Government has already sold a given tract within said boundaries, or a pre-emption right in favor of another party has already attached to said particular tract under some prior law, it is not for a moment to be supposed that it was intended to permit an entry of the tract of land so sold, or upon which such prior right had already attached. But if he is authorized in express terms to enter the specific tract, and no other, before sold or upon which the pre-emption right had attached, there can be no doubt as to the intent to allow the entry of that specific tract, whether it was in the power of Congress to give effect to that intent or not. And that is just the difference between the cases cited and the one now under consideration.

Of course if Congress intended to give to the *bona fide*

purchasers under Vallejo the first right to purchase, it did not intend that strangers to that title should, also, have the first right to purchase the same land under the general pre-emption laws, for the two ideas are repugnant, and the last specific expression of the legislative will, if within the power of Congress so to enact, must prevail over the former general and inconsistent provisions of the statute.

We are of the opinion, therefore, that the Act in question withdraws the lands which were purchased *bona fide* from Vallejo and reduced to possession prior to the rejection of the Mexican grant from the operation of the general pre-emption laws, and confined the right to purchase within the restrictions prescribed in the Act upon such purchasers from Vallejo, or his assigns. We have expressed this view several times before, and should now have been content to refer to the cases of *Hastings* v. *McGoogin*, 27 Cal. 85 ; *Page* v. *Hobbs*, 27 Cal. 487 ; *Page* v. *Fowler*, 28 Cal. 609, and *People* v. *Shearer*, 30 Cal. 650, had not eminent counsel elaborately argued the question with great earnestness and apparent confidence, and fortified their position by a more recent decision, which seems to support their view, of a highly respectable Federal tribunal—the Supreme Court of the District of Columbia—in the case of *Whitney* v. *Frisbie*, arising under the same Act, involving the same questions, and decided since the publication of our own decisions in the cases cited. But, after a careful review of the question, we are satisfied with our conclusion before attained.

The only other question made by counsel is, did Congress have the power to withdraw these lands from the operation of the general pre-emption laws after a competent party had entered with an intent to claim a pre-emption right, and before the right could be perfected by payment or entry, but while the party was not in default? This presents the naked question of *power*, not of the *propriety of its exercise*, conceding the existence of the power, nor *of mere good faith.* It is nothing less than a question of *power*. Congress having determined the question of policy, we have nothing to do

with that question, and there is no occasion to discuss it. The naked question is, did Congress have the power to withdraw these lands under the circumstances from the operation of the general pre-emption laws? If so, it is our duty to give effect to the statute in question.

On this point, after stating the withdrawal of the lands of the Soscol Rancho from the operation of the general preemption laws, we said in *Page* v. *Fowler*, 28 Cal. 609: "And there can be no doubt, that Congress had the power to thus withdraw the lands from pre-emption and sale, under the general laws, at any time prior to the acquisition by the settler of a right to the lands *that he could maintain against the United States, so as to secure ultimately the legal title.*" And in *People* v. *Shearer*, 30 Cal. 650, in ascertaining the character of the interest which a pre-emption claimant has in the land, we expressed the opinion that the land in the occupancy of a pre-emption claimant, and to which a pre-emption right has attached, may be withdrawn from the operation of the preemption laws of Congress at any time before payment has been made for the same to the United States, and referred to *Hastings* v. *McGoogin*, and *Page* v. *Hobbs, supra*, in which the question was directly made, and, by implication at least, determined. We also there expressed our approval of the opinion of Mr. Attorney General Speed on this point, given to the Secretary of the Interior for his guidance in disposing of the conflicting claims under the same Acts of Congress now under consideration, and in pursuance of which the Secretary of the Interior acted in making the decision which has given rise to this suit. (11 Opins. Attorneys General, 491.) Upon further consideration we find no reason to modify our views upon the question, but, on the contrary, we are fully satisfied of their entire soundness. No *proprietary* interest in the land, *as against the United States,* is acquired till payment. The parties embraced within the purview of the general pre-emption laws are simply authorized to enter the lands in preference to others, when the proper time comes, and the lands are thrown open for sale,

on paying the purchase money in the mode prescribed. It is a general law designating the order of preference to be given to parties desiring to purchase, and a rule for the guidance of the officers of the Land Department in the disposition of the. public lands which they are not authorized to disregard without the authority of Congress. It is a mere privilege conferred, so far as the rights of the pre-emptioners are concerned, in case the lands should ever be offered for sale. But they may never be thrown upon the market. There is no right whatever given to have the lands ever open for sale. There is no contract between the pre-emptioner and the Government. There is no obligation on the part of the pre-emptioner to take the property, or of the Government to sell. The claimant may, at the last moment, abandon his pre-emption and locate another, or may decline to take any, and the Government cannot complain. There is no mutual obligation—none on either side. The Government is not bound to sell at all, until, in its discretion, it elects to do so. The statute simply designates the person who shall have the first privilege to enter while the statute remains in force, and when the land is thrown open to entry in the ordinary course of the sales of the public lands. The Government cannot be compelled to throw open the land for entry, or to permit an entry to be made, till in its own good time it sees fit to do so. The pre-emptioner has no contract obligation which he can in any way enforce. If all pre-emption laws should be repealed and never re-enacted, a party who has merely entered as a pre-emptioner, without payment, would have no right which he could enforce against the Government. He would have no action for damages, and could not compel the issuing of a patent by mandamus. If a party goes upon the public land with a view to pre-emption, he does so knowing that it may never be sold. The Acts of Congress do not present the Government in the character of a party making executory contracts, but in the character of a Government which will, when it determines to sell its. public lands, generally dispose of them in accordance with.

certain rules established by itself. We have no doubt that it is competent for Congress, at any time before the payment of the purchase money, to withdraw the land from sale, reserve it for its own use, or repeal all pre-emption laws, and take away any right of entry thereunder. The *power* exists. It is only a question of good faith and expediency. The right of pre-emption is a mere privilege, given for the time being, and, whatever the case may be with reference to other claimants, while the law is in force, not a right of property *as against the Government*, and it can be withdrawn at any time before it has been perfected into an obligation which can be enforced against the Government itself, and that is before a sale and payment. Such is the view taken by several Attorneys General of the United States as to when a right of property vests as against the Government. (See opinion of Mr. Attorney General Cushing on pre-emption claims, 8 Opins. Attorneys General, 71; opinion of Mr. Attorney General Bates, 10 Opins. Attorneys General, 57; opinion of Mr. Attorney General Speed, 11 Opins. Attorneys General, 491.) And such, we are satisfied, is the correct view. A similar view was taken in *Bower* v. *Higbee*, 9 Mo. 261; and in *O'Hanlon* v. *Perry*, 9 Mo. 808. So the United States Supreme Court very pointedly intimate a similar view in *Hale* v. *Gaines*, 22 How. 161, where, in speaking of the character of a pre-emption claim, it is said: "Percival *had no vested interest in the land which a Court of Justice could recognize.* Then, the United States Government was the legal owner *and had the power to reserve from sale.*" And we know of nothing to the contrary in judicial decisions anywhere, other than the late case of *Whitney* v. *Frisbie*, referred to in this opinion. The language of the Act recognizing pre-emption rights is clearly not the language of grant, perfect or inchoate, nor of contract, nor obligation. It is simply permissive and directory. If the pre-emptioner acquires any right, *as against the Government*, before payment, it attaches from the very moment of entry upon the land with intent to claim a pre-emption right, and· thereafter it would be

incompetent for Congress, or the Government of the United States, in any mode to increase the price, or change any condition of purchase, reserve the land for public use, take timber, minerals, stone, earth, or other thing from it, or do anything affecting the land, without the consent of the party who has thus entered, and who, unless an implied license can be inferred from the legislation on the subject, is himself a trespasser. While, on the contrary, the settler could enter upon the land, and after stripping it of timber, or other valuable thing, abandon it at pleasure, and repeat the process *ad libitum*, and the Government could claim nothing under the pretended contract, which is binding only on one side. The whole public domain, by the conferring of this simple privilege of pre-emption, might thus be withdrawn from the power and control of Congress, under whose authority it is placed by the Federal Constitution. We do not think it was ever contemplated by Congress, in passing the pre-emption laws, that an entry upon the public lands, with a view of acquiring a pre-emption right, would give to the party entering a right, without any corresponding obligation to purchase, which could not afterward be withdrawn, or in any degree varied, without the consent of such party, or that such is the effect of the pre-emption laws upon any reasonable interpretation. Such is not the express provision of those Acts, and if the construction is open to doubt, or in any degree ambiguous, we have already seen—and so appellants claim the rule to be with respect to other points—that that construction must be adopted *which is most favorable to the public interest*, and, we apprehend, it will not be maintained that the public interest will best be promoted by subjecting the entire public domain to be withdrawn from the control of Congress upon such considerations. A pre-emption right is not an inchoate grant, nor, in any just sense, an inchoate title, *as against the Government*, whatever the rights of pre-emptioners may be as between individual claimants, while the pre-emption laws are unrepealed and still in force to "cover" the claim.

Several cases are cited from the. Supreme Court of the United States, by the learned Chief Justice of the Supreme Court of the District of Columbia, in the case before referred to, to sustain a different view, but, with the greatest respect for the opinion of that tribunal, and of such of our associates as adopt a similar view, as we conceive they do not touch the question. Thus, in *United States* v. *Fitzgerald*, 15 Pet. 407, the Court say : "It cannot be pretended that the land in controversy was reserved from sale by any Act of· Congress, or by order of the President, under the direction of the Secretary of the Treasury to reserve it from sale *several months after it had been actually sold and paid for* could amount to such an order." (15 Pet. 420.) Of course there could be no reservation "several months after it" [the land] had been *regularly actually sold and paid for*. This is something more than a pre-emption right. The party had availed himself of the privilege conferred, and the contract of sale had been actually entered into and the money paid. The contract was executed on one side, at least. Thenceforth the purchaser was, in *equity*, the actual owner of the land, and the United States merely held the *naked legal title*, without any beneficial interest, *in trust*, for the benefit of the purchaser. The land was no longer a part of the public domain. (*Carroll* v. *Safford*, 3 How. U. S. 460 ; *Astrom* v. *Hammond*, 3 McLean, 108 ; *Carroll* v. *Perry*, 4 McLean, 26 ; *Gwynne* v. *Niswanger*, 15 Ohio, 368 ; *Ross* v. *Supervisors Outagamie County*, 12 Wis. 38 ; *Goodlet* v. *Smithson*, 5 Port. 246 ; *People* v. *Shearer*, 30 Cal. 648.) That case certainly contains nothing inconsistent with any view maintained in this opinion. The case of. *Lytle* v. *State of Arkansas*, 9 How. 333, we have before cited, and it is wholly different from the present case. We commented upon that case in *People* v. *Shearer*, 30 Cal. 653, and endeavored to show that it contained nothing to support the position maintained by appellants, and it is unnecessary here to repeat what we there said. We will remark in addition, however, upon the passage deemed so conclusive, quoted from the opinion of Mr. Justice McLean by Mr. Chief

Justice Carter in *Whitney* v. *Frisbie*: "Until sanctioned by law, it [the pre-emption right] has no existence as a substantive right; but *when covered by the law* it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it." Undoubtedly so. We fully subscribe to this view in the sense and connection in which it was stated by the learned Justice. He was speaking of a right as between adverse claimants, under two different statutes, *both in force at the same time.* Cloyes claimed a pre-emption right, which had vested under the pre-emption laws *then in force.* The State of Arkansas, under authority of another statute, general in its terms, to select and enter a certain amount of land—not to enter a *specific tract*—for public purposes,.by its Governor *selected* the tract of land upon which Cloyes' pre-emption right had attached. The Court very properly held, and as any other Court, doubtless, would have held, that the State of Arkansas was not authorized to select *that* land, because a pre-emption right had already attached under a law *which was still in force,* and not repealed; that the two Acts were not inconsistent, and could stand together —that it was not intended to permit the selection of such lands as were then incumbered with other rights, and that the law under which Cloyes claimed was still in force. His claim was, therefore, at that time "*covered* by the law," and protected by it. The right was given by a law then in force, and was, therefore, as between him and the other claimant, a legal right, and being thus "covered by the law," it could only be defeated by failure to perform the conditions. This was all that was said, or intended to be said. But suppose the statute under which Cloyes claimed had been repealed before the right had been perfected by payment, and before the passage of the other Act authorizing the State of Arkansas to enter the lands, then the pre-emption right of Cloyes would have been no longer "covered by the law," and the conditions under which the learned Justice said it could not be defeated, except by failure to perform, would have ceased to exist. Or, suppose Congress to have authorized the State

of Arkansas to enter that specific tract of land, describing it by lines of the public surveys, or in such other manner that it could be easily identified, which would necessarily have been inconsistent with Cloyes' pre-emption right, and therefore have repealed it, and thus taken away the cover of the law, different questions would then have been presented, and one analogous to that now in hand.   But the case is only authority for a pre-emption right "*when covered by the law,*" which is not this case; and since the learned Justice was so careful to limit his language to the case before him, which *was so covered*, we must infer that he was of opinion that a different rule would prevail when the right ceased to be "covered by the law."

The case of *Delassus* v. *United States*, 9 Pet. 133, is the case of a Spanish grant protected by the treaty of purchase of Louisiana.   It was the case of an inchoate title in the grantee himself, as against the Government, *which had already made an incipient grant*—a very different thing from a pre-emption right under the pre-emption laws of the United States, in which case the *Government has not taken the first step toward making a grant.*   It has only prescribed a general rule for the government of all persons, and all its officers in the disposition of the public domain.   *Smith* v. *The United States*, 10 Pet. 330, was a similar case, and *Rice* v. *Railroad Company*, 1 Black, 360, was, also, a case of grant for railroad purposes. Neither of these cases therefore affords any aid in the solution of the question now under consideration.   If these cases were supposed to lend any support to the conclusions attained by the Supreme Court of the District of Columbia, with due deference, we are compelled to think their scope and bearing entirely misapprehended.

So the case of *McAfee* v. *Keirn*, 7 S. & M. 780, is a case where the pre-emption right, like that in *Lytle* v. *State of Arkansas*, was covered by a law then in force, and the patent to the other party was, therefore, issued by the officers of the Government without the authority of any law whatever.

So the cases of *Isaacs* v. *Steele*, 3 Scam. 99, and *Bruner et al.* v. *Manlove*, 3 Scam. 341, and all others cited to sustain the same view, are cases of the same sort, and are in no respect inconsistent with anything contained in this opinion.

We are at a loss to understand, also, how that learned tribunal could come to the conclusion that the Act of 1863 limited the *bona fide* purchasers from Vallejo to an entry of one quarter section in one tract in case of an interference with the claim of some pre-emptioner under the general pre-emption laws, in the face of the express provision that they might " enter according to the lines of the public surveys * * * *to the extent to which* the same had been *reduced to possession* at the time of the adjudication of said Supreme Court," and that they were to make proof of the " extent to which the tracts claimed had been reduced to possession at the time," etc.    To our minds it seems clear enough that the *bona fide* purchasers under Vallejo and their assigns were authorized to enter all the lands purchased, to the full extent to which the same had been reduced to possession at the time of the rejection of the grant, be it more or less, and without regard to intruders on such possessions.    Where a man had in good faith purchased and paid for a thousand acres, reduced it to possession, cultivated and improved it, till he had by his labor, money and inhabitancy increased its value two, three, four, or tenfold, as the case might be, the equities were just as strong in his favor as to the whole as though he had only purchased, improved, and thereby enhanced the value of one hundred sixty acres; and there would be just as little equity in allowing him to be deprived by a stranger of the fruits of his labor and expenditures, under the cloak of the general pre-emption laws, which could never have been intended to embrace such a case, of the excess over one quarter section; and the language of the statute, it seems to us, authorizes an entry of all which had been reduced to possession.    The object was to relieve what Mr. Justice Greer so feelingly calls a confiscation, and this object could only be accomplished by allowing the purchasers

to enter all, at least, that had been reduced to possession and materially enhanced in value by their labor. The land must, of course, be entered according to the lines of the public surveys, because all lands are so entered. The very object of the public surveys is to have a convenient, systematic, uniform, and certain mode. The reason for allowing joint entries by coterminous proprietors is obvious enough. The object is, in fact, expressed, "to enable them to adjust their respective boundaries," not to limit the amount which any one purchaser from Vallejo shall be permitted to enter. The smallest subdivision which can be entered under the system of surveys adopted by Congress is the sixteenth of a section, or forty acres. The purchases from Vallejo were made long before the Government surveys were made, and without reference to such surveys. It might often happen, therefore, that a forty or eighty acre tract would so fall as to embrace portions of lands held and possessed by two or more purchasers from Vallejo. As neither would be entitled to enter the whole, and as they must enter according to the lines of the survey, or not at all, neither could enter his own share alone; hence, in such cases, to enable the parties to enter all they had respectively purchased and reduced to possession, and to afterward adjust their boundaries between themselves, they were authorized to enter such tracts jointly.

We are unable to derive from these provisions any support to the idea that each purchaser from Vallejo must be limited to a quarter section in case of any interference with an intruder upon his possession claiming a pre-emption right under the general laws. On the contrary, they seem to us to support the opposite view, so far as any argument bearing on the point can be derived from them. It shows that nothing purchased and possessed in good faith was intended to be lost to them.

These are the great questions in the case upon which the rights of the parties to this action must turn, and the only points presented by appellant's counsel for our consideration, and on these points we should have entertained little doubt

had not the learned Justices of the Supreme Court of the District of Columbia, and two of our associates, as to one point, entertained a different opinion. Our respect for that tribunal, and for the opinions of our brethren, has led us to reconsider the questions with care; but with deference to the views of those who have reached a different result, upon further consideration, aided by the elaborate opposing opinions, and the very elaborate arguments of the eminent counsel engaged on the part of appellant, our former views are fully confirmed.

It is understood that the case of *Whitney* v. *Frisbie,* has been taken to the Supreme Court of the United States for review, on a writ of error. As the decision of that tribunal upon the questions involved would be authoritative and binding upon us, we were in hopes that there would have been an early decision, and we have delayed the decision in this case on that account. But we have satisfied ourselves that a decision in that case cannot be expected for a long time to come, and we do not feel justified in any longer delay. As both parties claim a right under a statute of the United States, the decision in any event must be against a right claimed under a law of Congress, and our decision can doubtless be reviewed by the Supreme Court of the United States. Since we entertain a different view from that taken by the Supreme Court of the District of Columbia and two of our associates, it is gratifying to know that there is an arbiter between us in the Supreme Court of the United States, and that, if we are in the wrong, our error can be corrected and justice be awarded by that august tribunal.

Judgment affirmed.


Mr. Justice CROCKETT delivered the following dissenting opinion, in which Mr. Justice SPRAGUE concurred:

On the facts as presented by the record in this case, there are two questions for our consideration, to wit: First—

Whether or not, by the special Act of March 3d, 1863, Congress intended to confer upon the purchasers from Vallejo a prior right to acquire by pre-emption the title to the lands so purchased, (and which had been reduced to possession when the claim of Vallejo was rejected by the Supreme Court,) to the exclusion of other qualified pre-emptioners who had settled upon the land after the rejection of Vallejo's claim, but before the passage of the special Act in question, and were in good faith performing the acts necessary to perfect their pre-emption claims.   Second—If such was the intent of the Act, was it competent for Congress thus to set aside and annul the claims of the first pre-emptioner and to confer on the purchasers from Vallejo a prior right to enter the land? On the first point I entertain no doubt whatever.   When construed in the light of the surrounding facts, the Act of March 3d, 1863, is not open to cavil on this point.   Congress obviously considered the purchasers from Vallejo as having the best right and prior equities, and as entitled to priority over all other pre-emptioners, without reference to the date of settlement.   Indeed, it was the chief purpose of the Act to secure this priority, and at the same time to enlarge the quantity which might be pre-empted, in certain cases, beyond the usual limit of one hundred and sixty acres.   I deem it unnecessary to enter into an elaborate discussion of this point, which, in my opinion, is too plain to admit of serious debate.

The second question for our decision is not only more difficult of solution, but is one of unusual gravity and of great practical importance.   It involves a consideration of the relations which are established between a qualified pre-emptioner and the Government, after the former has entered upon a portion of the public domain, which is subject to pre-emption, and is proceeding in good faith to perform the conditions which, by law, will establish his right to pre-empt the land.

This question has been several times decided by this Court in actions growing out of the special proceedings which have

been had in respect to the title to the Soscol Rancho. On every occasion when the question has been before this Court, it has been held that the pre-emptioner acquired no proprietary interest in the land, which was capable of enforcement either at law or in equity, as against the Government or its grantee, until the purchase money was paid or tendered, and that until such payment or tender, the power of the Government over the title remained wholly unimpaired, and it might disregard altogether the claim of the pre-emption claimant and award the land to another. (*Hastings* v. *McGoogin*, 27 Cal. 85; *Page* v. *Hobbs*, 27 Cal. 487; *Page* v. *Fowler*, 28 Cal. 609; *People* v. *Shearer*, 30 Cal. 650.)

The same views have been expressed by Attorney General Cushing, (8 Opins. Attorneys General, 72,) and by Attorney General Bates, (10 Opins. Attorneys General, 56,) and by Attorney General Speed (11 Opins. Attorneys General, 490.) The Supreme Court of Missouri, in several cases, has acquiesced in this view of the law. (*Bower* v. *Higbee*, 9 Mo. 259; *O'Hanlon* v. *Perry*, 9 Mo. 804.) The Supreme Court of the United States, in dealing with inceptive titles under the pre-emption laws, has intimated in several cases that until the pre-emptioner has not only performed the conditions required by law, but has obtained the certificate of the proper officers of the Land Department to that effect, he has no title which a Court of justice will recognize; that this is the *only* evidence of that fact which is admissible to establish even an equity in the claimant, and until he obtains the certificate he has no standing in Court.

In *Hale* v. *Gaines*, 22 How. 144, the plaintiff claimed under the alleged pre-emption right of one Percival, who settled on the land in 1812, but took no steps toward entering it until after the land was reserved from sale by an Act of Congress passed in 1832. In commenting on this claim (page 161) the Court says: "When the Act of April, 1832, was passed, reserving the hot springs from sale, Percival had no vested interest in the land that a Court of justice could recognize. Then the United States Government was the

legal owner, and had the power to reserve it from sale; so that the offer to purchase in 1851, under the assumed preference to entry claimed for Percival, was inadmissible. Had the entry been allowed in face of the Act of Congress, such proceeding would have been merely void."

In deference to these authorities I acquiesce in the conclusion at which the Chief Justice has arrived, notwithstanding the fact that the reasoning by which the conclusion is reached appears to me to be altogether unsatisfactory. I yield to the weight of authority only, and not to the reasoning by which it is supported. But it has almost grown into an axiom in the law that a long established error is often less pernicious than the change which would be necessary to correct it; and the rule of *stare decisis* should not be often or lightly departed from.

It is entitled to especial weight in all questions affecting the titles to real estate, and particularly in a new country, which is rapidly improving, and where large sums are being constantly invested in lands and buildings. The question now under consideration was first decided by this Court in the case of *Hastings* v. *McGoogin*, at the October Term, 1864, and again in *Page* v. *Hobbs*, at the January Term, 1865, and in *Page* v. *Fowler*, at the October Term, 1865. In all these cases the question arose under contests growing out of conflicting claims to portions of the Soscol Rancho. We know as a part of the current history of the times that there are several considerable towns on this rancho, one of which (Vallejo) is rapidly improving, and has become a point of considerable commercial importance; that a railroad from Sacramento to Vallejo now traverses this rancho, which is situate in one of the most rapidly improving portions of the State. It cannot be doubted that large sums have been invested in lands and buildings on this tract on the faith of the decisions to which I have adverted. They should therefore be considered as having become a rule of property in respect to that rancho. In this view of the case I yield to their authority, and acquiesce in the conclusion to which the

Chief Justice has arrived. The same question was elaborately discussed and the same conclusion reached in the case of *People* v. *Shearer*, 30 Cal. 645, decided at the October Term, 1866. But the question involved is of great public interest, and believing that this Court has established it on a wrong basis, I propose to state the reasons for this opinion.

It cannot be successfully controverted, I think, that the pre-emptioner belongs to a favored class of purchasers; that he enters on the invitation of the Government with an assurance that on the performance of certain conditions and on the payment of a specified sum of money he shall receive a title to the land; that after he has entered and has expended his money and labor in improving the land, and is proceeding in good faith to fulfill the conditions, he has acquired an equity which, in sound morals and by the rules of law, the Government is bound to respect, and which Courts of equity will enforce, as against a subsequent grantee of the Government who wrongfully acquires the legal title.

On the other hand, it is contended that a pre-emptioner is but a pensioner on the bounty of the Government; that he acquires no title, either legal or equitable, until he has actually paid for the land; that even though he has performed all the other conditions, and as the final act tenders payment of the purchase money, the Government is not bound to accept it; but may repudiate his claim and sell the land to another, who will thereby acquire a valid title, charged with no equities in favor of the pre-emptioner; that there is nothing in the nature of a *contract* between the Government and the pre-emptioner who enters with notice that the Government reserves the right to withhold the title from him and confer it on another, and at the last moment to decline to accept payment from him, even though he has performed all the other conditions prescribed by law. This last proposition is urged chiefly on the theory that, inasmuch as the pre-emptioner is under no obligation, either legal or moral, to perfect his claim and pay the purchase money, the Govern-

ment has the correlative right at any time before payment to withhold the title and disregard the pre-emption claim.

If it be assumed that the relative rights of the pre-emptioner and the Government are to be tested by the rules strictly applicable to contracts, in their legal sense, between private individuals, it is doubtless true that until performance and payment there is no *executed* contract. In all cases where the rights of a party are to depend on the performance of conditions precedent, the right is not complete until the conditions are performed. Nevertheless, it would not be accurate to say that the party, whilst faithfully engaged in performing the conditions, had acquired no rights in the subject matter of the contract. On the contrary, so long as he is in no default he has acquired the right to compel the other party to the agreement not to obstruct him in the performance of the conditions, and, after a full performance of them, to comply with the other side of the contract. But, it is said that, until the purchase money is paid, there is no *contract* between the pre-emptioner and the Government; that there is nothing obligatory on either side until the land is paid for; that the pre-emptioner may abandon his claim at the last moment; and, in like manner, the Government may withdraw its offer, even after payment is tendered and all the other conditions are performed. In matters of contract the Government stands upon the same footing as a private individual. Whatever would constitute a contract between two private individuals would be equally a contract if the Government was a party to it. If the relations between the pre-emptioner and the Government do not constitute a contract in any just or legal sense, the same result would follow if the same relations existed between two private persons. For example, if that which is now the public domain was the property of a private person, some great landed proprietor, who desired to have his vast estate cut up into small farms, improved, settled upon, and cultivated, and to that end should proclaim in the most solemn manner that if any

citizen over twenty-one years old, and the head of a family, would settle upon a tract not exceeding one hundred and sixty acres, erect a dwelling house, cultivate the land, and pay one dollar and twenty-five cents per acre for it, he should receive a deed for the tract so occupied, the proprietor of this large estate would occupy towards those who should accept his offer precisely the same relation which exists between the Government and the pre-emptioner. Would this constitute a contract between them? If a citizen, properly qualified, and relying on the promise and good faith of the owner, should select a tract of one hundred and sixty acres, enter upon it, fence it, erect his dwelling, plant his orchard, and in due time offer to pay the stipulated price, could the proprietor at the last moment repudiate the whole transaction, oust his confiding victim from the possession, confiscate his improvements, refuse to accept the purchase money, and convey the title to a stranger, with notice of the equities of the former occupant, all on the ground that there was no *contract* between them? To hold that there was no remedy in such a case and that the title passed to a second purchaser, discharged from the equities of the first, would shock our moral sense and bring a just reproach upon the law. But the law is fertile in resources to meet such a case as that supposed. The injured party could either maintain a personal action for a breach of the contract, or a bill in equity for a specific performance of it; and it would be no answer to such a bill to say there was no contract, or that it lacked mutuality, because the plaintiff was under no obligation to perform the conditions, and incurred no penalty if he failed to perform them. The same principle pervades a large class of cases. If a reward be offered for the recovery of stolen property, no one is under obligation to seek for the property in order to earn the reward. But if any one sees fit to do it, and restores the property, the contract becomes operative, and he can maintain an action on it for the reward. If a premium is offered for the best steam engine, to be delivered within a specified time, no one is bound to compete

for the premium; but if a mechanic, relying on the promise, expends his labor and money in the production of a model engine, and is ready to deliver it within the appointed time, it would be too late to withdraw the offer when the work was on the eve of completion. So if the owner of a mine offers to pay a given sum to any one who will sink a shaft on it to a specified depth within a given period, it would not be in his power to withdraw the offer when the shaft was sunk to a point within six inches of the required depth. The general principle which pervades all this class of cases is, that if a person by his words or conduct induces another to expend his labor or money in the achievement of a particular work, on the promise of payment when the conditions are fulfilled, the promise becomes obligatory as soon as the work is entered upon and is prosecuted in good faith. Though the offer was general, and made to the whole world, yet when a particular person accepts it and enters upon the performance of the conditions in good faith, it thenceforth becomes, in law, a specific promise to that person, and is to every intent as obligatory as if made to him in person and in express terms. Nor is the promise void for want of considerations. On the contrary, it has all the elements of a valuable consideration, to wit: a benefit to the party who promises, in case the work is performed, and an injury to the other party, who expends his money and labor in performing the conditions. The term "mutuality," in its strict legal sense, has no application to promises of this character whilst the conditions are being performed. Before the performance is commenced, the promise is not obligatory, and may be withdrawn. It was but a mere offer, not accepted, and supported by no valuable consideration. But when the offer is accepted and the performance is commenced in good faith, the conditions are thenceforth changed. That which before was a voluntary offer, without consideration, has become by the mere force of the acceptance, and by a part performance in good faith of the conditions, an obligatory promise founded on a valuable consideration; and on a full

performance of the conditions, the promise, which before was conditional, will have become absolute and of perfect obligation in law. If the conditions to be performed be of a personal nature, not affecting the title to real estate, the remedy for a breach of the promise would be an action for damages, or such other personal action as the exigency of the case might require. But if the promise be to convey real estate, on the performance of the conditions, a bill for specific performance would lie.

I have adverted to these general propositions, not because they are either novel or difficult of solution, but, on the contrary, because they embody only familiar and well settled principles, which, I apprehend, will not be questioned. I propose now to inquire to what extent, if at all, these principles are applicable to the relation existing between the pre-emptioner and the Government.

It is said, and this Court has intimated in several cases, that the right of pre-emption, secured to the settler by the general pre-emption law of 1841, is in the nature of a bounty voluntarily offered by the Government to its citizens, and may be withdrawn at any time before the purchase money is paid; and that until payment is made, the pre-emptioner has acquired no proprietary interest in the land which is capable of enforcement either at law or in equity. In the solution of this question, it must be borne in mind that the Government is simply the owner in fee of the public domain, with a plenary power to manage, control or dispose of it as it sees fit. It holds it in trust, it is true, for the people, whose agent and trustee the Government is, but with plenary power as to its control and disposition. In dealing with purchasers, touching the sale of its domain, the Government is only a great landed proprietor, holding immense bodies of wild land, which the public interest demands should either be sold for the best price it will bring, or awarded to actual settlers at a very low price. The latter has been for many years a favorite policy with the Government. It was deemed advisable to sell the lands to

actual settlers at a low price, and thus promote the rapid
expansion of our national wealth and the speedy develop-
ment of our agricultural resources, rather than to sell, for a
higher price, to speculators, who would or might keep it out
of the market, and thus greatly retard the growth of the
country.  But it is a flagrant perversion of terms to say that
the pre-emption right, secured by law to the actual settler,
is in any just sense a "bounty," if by that term it is intended
to be implied that it is a mere gratuity, and for that reason
may be withdrawn after acceptance.  That it is in no sense
a gratuity, is proved by the fact that the pre-emptioner is
not only required to expend his money and labor on the
land, thereby enhancing the value of the coterminous lands,
and adding to the taxable property from which the revenues
of the Government may be derived, but he is also required
to pay a consideration in money before his right to the lands
becomes complete.  A transaction of this character, what-
ever else it may be, is in no sense a gratuity; and if it be in
any respect a "bounty," it is only so in the sense of a liberal
compensation for services rendered and money paid by the
other party to the agreement.·  It may more aptly be styled
a liberal contract, by which the Government agrees that if
the settler will perform certain acts tending to promote the
public good, and will pay a certain moderate sum of money,
he shall receive the title to a specified parcel of land.  The
Government, on its part, makes the contract through the
medium of general laws, as it is competent to do.  It is well
settled that contracts obligatory on the Government may be
thus made.  But it might also contract through special laws,
or general or special agents duly authorized.  No one will
deny that instead of seeking to accomplish the result by
means of general laws, Congress might have authorized the
Commissioner of the General Land Office or the Registers
and Receivers in the several districts to enter into a written
contract with each individual pre-emptioner, to the effect
that if the latter would erect a dwelling house on a specified
parcel of land, and reside on it with his family, and at the

expiration of twelve months would pay a stipulated sum for it, he should receive a patent for it. If the Commissioner of the General Land Office, acting under a special authority of this nature, had entered into a written contract with the plaintiff in this action, to the effect that if he would enter on the quarter section in contest, erect a dwelling house on it, cultivate and improve it, and within a specified time would pay for it at the rate of one dollar and twenty-five cents per acre, and if the plaintiff had accordingly entered on the land, erected his dwelling, and was proceeding in good faith to perform the other conditions, can any one doubt that the Government would have been bound, both in law and morals, to fulfill its obligation? If it had commenced an action of ejectment against the plaintiff to recover the possession, it would have been a complete answer to the action to set out the contract, and aver that the defendant was proceeding in good faith to perform it on his part. If the Government, in disregard of its obligation, whilst the plaintiff was in the actual performance of the conditions, had conveyed the land to another, and thereby attempted to confiscate the improvements already erected, could such a transaction be properly characterized, in any just sense, as merely a withdrawal by the Government of a proffered "bounty" to the plaintiff? Would it not be an abuse of language to term it a simple revocation of a gratuity voluntarily offered, and having none of the elements of a contract? On the contrary, if such a transaction had occurred between private persons, I apprehend no one would deny its validity or that it could be enforced in a Court of equity. If the Government be one of the parties to the contract, I can imagine no reason why it is, for that cause, less obligatory. The remedy for enforcing it may be different, inasmuch as the Government cannot be sued in its own Courts to compel a specific performance of its contracts. But that is a question pertaining to the remedy, and not to the obligatory force of the contract.

My conclusion is, that if the Government, through its duly authorized agent, had entered into an express covenant to

the plaintiff touching this land, embodying therein the sub
stance of the pre-emption laws, it would have been obliga-
tory on the Government, so long as the plaintiff was in no
default in performing the conditions. Nor do I perceive
that the plaintiff's condition is worse because there was no
express covenant, except such as results from the pre-emp-
tion laws, and the commencement to perform in good faith
the conditions which they impose. It is unquestionably
competent for the Government to contract, either by means
of general or special laws dealing directly with the subject
matter, or by delegating its authority to specified officers or
agents. In the former case, the subject matter of the con-
tract and the rights and obligations of the parties are defined
in the Act itself. An example of this species of contract
may be found in the laws offering pay or bounties to soldiers
or seamen who enlist in the service. When the conditions
are performed the contract becomes complete by operation
of law, and is as obligatory on the Government as if there
had been a prior express contract with the party in person.
But the law regulating pre-emption rights is, perhaps, as
striking an illustration as could be found of this species of
contract. The law defines with the utmost precision what
class of citizens shall be entitled to its benefits, and what
acts they shall perform; limits the quantity of land to be
purchased; prescribes in what manner and before what offi-
cers proof is to be made of the performance of the con-
ditions; and expressly provides that, on making such proof
and paying the purchase money, a patent conveying the title
shall issue. When the conditions are performed and the
purchase money paid, the contract is completely executed by
the pre-emptioner; and it is conceded on all sides that he
thereby has acquired a complete equity—a vested interest in
the land which it is not in the power of the Government to
take away; and if the proper officer of the Government
refuses to issue the patent, he can be compelled to do so by
the compulsory process of the law. But it is claimed that,
even though all the other conditions have been performed,

and the pre-emptioner is ready and willing and offers to pay the purchase money, the Government may refuse to accept it, repudiate the whole transaction, oust him from the possession, confiscate his improvements, and convey the land to another, who takes the title with notice of all that has transpired, and who will hold it, discharged from the equities of the pre-emptioner. I am unable to appreciate the force of the reasoning by which it is sought to sustain this proposition. If the pre-emptioner has done all that the law required of him, except to pay the purchase money, and if he was and is ready and willing to pay it in proper time, but is prevented from doing so only by the act of the Government or its authorized agents, I do not comprehend on what principle of law or equity, reason or justice, his right should be deemed less complete or his title less secure than if he had actually paid it. An offer to perform conditions precedent in the proper time and manner, is always deemed equivalent to performance in Courts of equity; and if performance be prevented by the act of the other party to the contract, the failure to perform in the prescribed method, or within the appointed time, is excused. The precise point under discussion has been decided by the Supreme Court of the United States in the case of *Lytle* v. *The State of Arkansas*, 9 How. 333, in which the Court says:

"It is a well established principle that where an individual in the prosecution of a right does everything which the law requires him to do, and he fails to attain his right by the misconduct or neglect of a public officer, the law will protect him. In this case the pre-emption right of Cloyes having been proved, and an offer to pay the money for the land claimed by him, under the Act of 1830, nothing more could be done by him, and nothing more could be required of him, under that Act. And subsequently, when he paid the money to the Receiver, under subsequent Acts, the surveys being returned, he could do nothing more than offer to enter the lands, which the Register would not permit him to do. This

claim of pre-emption stands before us in a light not less favorable than it would have stood if Cloyes, or his representatives, had been permitted by the land officers to do what, in this respect, was offered to be done."

In the case at bar, before the time for payment had arrived, and, indeed, before payment was possible, Congress, by the Act of March 3d, 1863, attempted to deprive the plaintiff of the equity he had acquired by a part performance of the conditions, and to award to the defendants a prior right to purchase the lands. The plaintiff has been in no default, and has done all that the Government would permit him to do toward performing every act, including payment, required of him by the law under which he entered. If he has been prevented by the Government from making a complete performance, the omission is excused, and the equity is as complete as a full performance would have made it. The fact of payment or the omission to pay, under the conditions stated, is wholly immaterial, and in no degree impairs the plaintiff's equities. If Congress can defeat the title by refusing to accept the purchase money when tendered, or by placing it out of the power of the party to perform the remaining conditions, I can imagine no reason why it could not annul his claim after accepting the purchase money, and it is conceded this could not be done. But it can do neither, and for the same reason. After a full performance of the conditions, it is admitted the plaintiff's equity would have been complete and beyond the reach of hostile legislation. After a partial performance, if he was hindered by the act of the Government and without any fault of his from performing the remaining conditions, the non-performance is excused for the reasons already stated; and his equity is as secure from invasion as though all the conditions, including payment, had been performed.

It is said, however, that great evils will result from this construction of the law; that it will deprive Congress of all

control over such portions of the public domain as shall already have been occupied by pre-emptioners; that a tract thus occupied could not thereafter be reserved from sale, even though it were needed for a lighthouse or fortification, and however urgent the necessity for such an appropriation of it. I think the inconvenience anticipated from this source is in a great degree imaginary.

But, if it be otherwise, a simple remedy for it may be found in the future by an amendment of the law, reserving to the Government the right to cancel a pre-emption claim when the land is needed for public use. This would become a part of the contract, and would completely remedy the supposed inconvenience; but, if the inconvenience to result from my construction of the law were even greater than it is supposed to be, it would still be insignificant in comparison with the greater evil of permitting the Government to violate its engagements to its citizens. The stability of all republican government rests upon the confidence of the people in its fidelity to its pledges; and it is the duty of the Courts, as far as practicable, to promote this confidence by exacting from the Government, in all cases which come before the judicial tribunals, a faithful performance of its contracts.

I have thus far discussed the grave question under consideration upon such general well known principles of law as I have deemed pertinent to the subject. But there are, also, some authorities to support the views I have indicated. That a pre-emption claim, whilst the proceedings to perfect it are *in fieri*, is recognized by the Government as *property*, is established by the second section of the Act of March 3d, 1843, (5 Stats. at Large, 620,) which provides that if the pre-emptioner shall die whilst the conditions are being performed his claim may be perfected by the heir at law, to whom the patent shall issue. That he is not a trespasser, but, on the contrary, that he enters and expends his money and labor on the land, on the invitation of the Government, and on the assurance that he will acquire the title by the performance

of the conditions, is apparent from the whole spirit and theory of the pre-emption system. That the right which he acquires by his entry, and by commencing in good faith to perform the conditions, is a substantial right, which the Government is bound to respect, and which the law will protect so long as he is in no default, appears to be established by the case of *Lytle* v. *The State of Arkansas,* 9 How. 333, in which the Court say: "The claim of a pre-emption is not that shadowy right which by some it is considered to be. Until sanctioned by law, it has no existence as a substantive right. But when covered by the law it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it. It is founded in an enlightened public policy, rendered necessary by the enterprise of our citizens. The adventurous pioneer, who is found in advance of our settlements, encounters many hardships and not unfrequently dangers from savage incursions. He is generally poor, and it is fit that his enterprise should be rewarded by the privilege of purchasing the favorite spot selected by him, not to exceed one hundred and sixty acres." By the term "covered by the law," as here employed, the Court evidently intends to say that when the pre-emption claim is being perfected in the method prescribed by the statute, "it becomes a legal right, subject to be defeated only by a failure to perform the conditions annexed to it." In referring to the previous case of *Brown's Lessee* v. *Clement,* 3 How. 666, the Court says: "The Act of 29th May, 1830, *appropriated* the quarter section of land in question, on which Etheridge was then settled, to his claim, under the Act, for one year, subject, however, to be defeated by his failure to comply with its provisions. During that time this quarter section was not liable to any other claim." Again, in referring to the claim of Cloyes, the pre-emptioner, whose rights were under discussion in that case, the Court says: "By the grant to Arkansas, Congress could not have intended to impair vested rights." Cloyes, the pre-emptioner, had performed the other conditions, but had not paid the purchase money; and yet the

Court deems him to have acquired a "vested" right in the land, of which he could not be deprived except by his own default.

In the subsequent case of *Barnard's Heirs* v. *Ashley's Heirs*, 18 How. 43, the Court say:

"In *Lytle's Case* we declared that the occupant was wrongfully deprived of his lawful rights of entry under the preemption laws, and the title set up under the selection of the Governor of Arkansas was decreed to Cloyes, the claimant, this Court holding his claim to the land to have been a legal right, by virtue of the occupancy and cultivation, subject to be defeated only by a failure to perform the conditions of making proof and tendering the purchase money. There the facts were examined to ascertain which party had the better right."

This language admits of no doubtful interpretation. If Cloyes obtained "a legal right by virtue of the occupancy and cultivation" prior to payment, why did not the plaintiff in this action obtain a "legal right" under the same circumstances? The cases appear to me to be strictly analogous.

In *McAfee* v. *Keirn*, 7 S. & M., Miss., 780, Mr. Justice Sharkey, who delivered the opinion of the Court, defines with clearness and force the nature and legal effect of a preemption right. He says: "We cannot question the right of Congress to confer this privilege on the actual settler, and the fact that it was a gratuity makes no difference—the right is as valid as though it had been founded on a valuable consideration. It amounted to something more than a mere right to enter the land at Government price; that right every citizen had, and if the Act of Congress did no more, it was useless. But it did more; it gave a preference to the actual settler, the effect of which was to exclude the right of all others so long as this preference could be claimed. * * * This right of pre-emption, then, constituted an equity in favor of the occupant. Not an uncertain, indefinite equity;

it was located and identified; it attached to the particular quarter section occupied and cultivated by the claimant. The Act of Congress was an appropriation of all land so occupied. This equity might be lost, of course, by a failure to make the entry within the prescribed time, but during the whole of that time the occupant had the right to make the entry at the minimum price to the exclusion of all other entries. * * * Equity looks to the incipient right, and couples to it the perfect title, and in a Court of equity the person who has first appropriated the land has the best title."

In *Isaacs* v. *Steel*, 3 Scammon, 97, in commenting on the time allowed by law to the pre-emptioner to make his proofs and pay the purchase money, the Court says that "to protect them from the rapacity of those who might desire to appropriate their soil and labor to themselves, one and two years of time was granted them. The settler was thus made secure in his possession for that time; and if, before its expiration, he made the required proof and paid the money, he acquired a right against all the world." (See, also, *Bruner* v. *Manlove*, 3 Scam. 340.) It would be an abuse of terms to say that the settler was "made secure in his possession," if, at the last moment, after he had expended his money and labor on the land, and when he was proffering payment for it, Congress could annul his claim, deprive him of the possession, and grant the land to another.

In the case of *Whitney* v. *Frisbie*, which involved precisely the same questions which arise in this case, the Supreme Court of the District of Columbia has recently decided them, explicitly, in accordance with the views above set forth.

For these reasons I cannot but conclude that the former decisions of this Court on this point are at variance with the principles of reason and equity. Nevertheless, so far as they affect the title to the Soscol Rancho, the question has been so often decided during the last five years, and such important interests have grown up on the faith of these decisions, that I think they are justly to be regarded as a rule of property in respect to that rancho, and ought not to be disturbed.